Linda DONATO, Plaintiff–Appellant,

v.

PLAINVIEW–OLD BETHPAGE CENTRAL SCHOOL DISTRICT; Edward Metzendorf, Defendants–Appellees.

No. 1418, Docket 95–7862.

United States Court of Appeals,
Second Circuit.

Argued May 10, 1996.

Decided Sept. 24, 1996.

Joseph P. Marro, New York City, for Plaintiff–Appellant.

Gregory J. Guercio, Plainview, NY (Guercio & Guercio, of counsel), for Defendants–Appellees.

Before CARDAMONE, ALTIMARI, and PARKER, Circuit Judges.

CARDAMONE, Circuit Judge:

At the time of her discharge from employment, plaintiff Linda Donato (plaintiff or appellant) was a probationary assistant principal in the Plainview–Old Bethpage Central School District (District). An assistant principal serves a number of constituencies, ordinarily doing better with some than others; the exceptional assistant principal does well with all of them. But here, according to her

employer, plaintiff did well with none of the constituencies—not with staff, students, parents, teachers, or with her supervisor, the principal. In short, she allegedly did nothing right and everything wrong.

Plaintiff appeals from a judgment entered August 7, 1995 by the United States District Court for the Eastern District of New York (Wexler, J.) dismissing both her Fourteenth Amendment due process claim brought under 42 U.S.C. § 1983 and her retaliatory discharge claim brought under the Civil Rights Act of 1964. The latter ruling necessitates a brief discussion of the law of retaliatory discharge. Plaintiff's challenge to the first decision requires us to consider what process is constitutionally due a public employee discharged amidst allegedly stigmatizing accusations of professional incompetence. When acting as an employer, the state must still heed the Fourteenth Amendment's command not to "deprive any person of life, liberty, or property, without due process of law." Because the District's charges leveled against plaintiff strike at the heart of her professional competence, damaging her professional reputation to such a degree as to virtually foreclose her ability to continue working in her chosen field of 28 years, the charges implicated and deprived her of a liberty interest under the Fourteenth Amendment. Such a deprivation requires that she be granted a name-clearing hearing.

## BACKGROUND

### A. *Underlying Facts*

Plaintiff Donato, a resident of Smithtown, New York, was first employed by the defendant District as a social studies teacher on September 1, 1966 and received tenure for that position in 1969. On September 1, 1981 Donato became chairperson of the Social Studies Department and obtained tenure as chairperson three years later.

In 1978, before her appointment as chairperson, Donato and several other women teachers challenged the District's mandatory maternity leave policy as discriminatory. The parties resolved the lawsuit, in which Donato's name appeared as lead plaintiff, in a 1981 settlement agreement that restored seniority rights and certain other benefits to Donato and the other plaintiffs. When the State Teachers Retirement System refused to grant retirement service credits as contemplated by the settlement agreement, New York State enacted legislation ordering that the credits be granted. *See* Plainview–Old Bethpage Central School District—Service Credit for Certain Teachers, 1988 N.Y. Laws ch. 786. The District responded by bringing a lawsuit attacking the state statute's constitutionality. *See Board of Educ., Plainview–Old Bethpage Cent. Sch. Dist. v. Donato,* No. 3420–89 (N.Y.Sup.Ct. Aug. 18, 1989) (mem. op.). In dismissing the District's suit, the New York State Supreme Court, Albany County, observed that the District had used every imaginable available remedy to avoid paying the teachers' benefits.

On August 16, 1991 Donato's career as an educator continued its upward spiral. The Superintendent of Schools appointed plaintiff to the position of Junior High School Assistant Principal for the school year starting on September 1, 1991. It is plaintiff's performance while serving in this capacity that is the subject of the instant litigation. The Superintendent's hiring notice described plaintiff's appointment as "probationary." She was not eligible for tenure until September 1, 1994, the date that would mark the end of the three year probationary period.

According to Donato, she served her first year as assistant principal without any difficulty. Her immediate supervisor, Principal Edward Metzendorf (also a defendant in the present action), wrote a memorandum dated April 10, 1992 evaluating Donato's first year as assistant principal. His critique suggested plaintiff accelerate her efforts to learn the master scheduling system, become more effective in managing discipline, improve communications with other staff members, provide improved instructional supervision, and work longer hours. Donato sent Metzendorf a reply memorandum defending her performance in all these areas.

Plaintiff contends that at the conclusion of her first academic year as assistant principal in June 1992, the District and Metzendorf began a course of conduct designed to damage her professional career. As proof, she

points to several examples. First, on July 1, 1992 Metzendorf prepared a memorandum—which he placed in plaintiff's file—criticizing her decision to leave on vacation in early July, because leaving interfered with her scheduling responsibilities. Donato wrote in response that Metzendorf had approved her vacation plans and that she had fully complied with all her contractual obligations. She also described Metzendorf's placement of this memorandum in her personnel file without first affording her an opportunity to refute his assertions as an unprofessional action that violated her rights. Despite this negative action by Metzendorf, his next evaluation of plaintiff was more favorable. Metzendorf's September 1992 summary evaluation, in which he conditionally recommended continuing plaintiff's probationary status, referred to "many positive aspects" of plaintiff's conduct and praised her "extensive administrative experience."

Second, plaintiff alleges that Metzendorf made a comment at a routine school board meeting on September 23, 1992 that reflected the District's animus towards her. At this meeting, she asked Metzendorf why he had recently made certain negative statements about her. He replied that the District Superintendent and the Board of Education (Board) had told him to put things in writing about her, and added that if he did not follow the Board's instructions, they would "chop [his] legs off." Metzendorf says he spoke these words in a different context and was in fact referring to the District's desire to make certain spending cuts.

Third, Donato disputes the accuracy of three evaluations prepared by Metzendorf. In November 1992, he wrote that plaintiff lacked competence in the area of master scheduling, was ineffective as a disciplinarian, and showed a lack of concern in her interactions with parents. In a December 1992 follow-up evaluation, Metzendorf detailed the chronology of her lapses in class-scheduling and stated that the events "indicate[ ] [plaintiff's] lack of understanding of the scheduling of classes ... and [her] lack of commitment to this assigned responsibility." He also condemned her handling of student harassment problems as "ineffec-

tive." In his third performance evaluation, made in February 1993, Metzendorf again referred to plaintiff's insufficient effort and commitment to her scheduling tasks and also noted her lack of understanding of teacher schedules. He discussed her failure to investigate possible gang activity in the school and described her instructional supervision as "insufficient in scope and quantity." Metzendorf also criticized Donato for repeated lateness and inconsistent lunchroom supervision.

Donato insists that Metzendorf's evaluations "contained factual distortions and untrue incidents," as well as "misstatements of fact and outright fabrications." These evaluations were placed in her personnel file and thereby became part of her permanent employment record.

As a result of these adverse reports, District Superintendent Henry Grishman wrote to plaintiff on April 2, 1993, telling her of his recommendation that the Board remove her as assistant principal as of June 30, 1993. The Board accepted his recommendation and, on May 17, 1993, voted to terminate Donato's employment. When plaintiff requested a statement of reasons for Grishman's recommendation, he sent her the following list, which he described as not being all-inclusive:

1. Failure to perform the master scheduling responsibilities;

2. Failure to effectively manage discipline at the seventh and eighth grade levels;

3. Poor secondary staff relations;

4. Ineffective parent interaction[;]

5. Failure to provide adequate instructional supervision;

6. Failure to complete administrative responsibilities, such as cafeteria supervision and attendance at meetings;

7. Failure to consult with supervisor regarding summer work schedule;

8. Inability to accept constructive criticism; and

9. Ineffective commitment to the Middle School.

As with the Metzendorf evaluations, Donato denies the accuracy of all these allegations.

## B. *District Court Proceedings*

Plaintiff originally filed suit on March 30, 1993 against the District and Metzendorf in the United States District Court for the Eastern District of New York (Wexler, J.). She claimed in her complaint that Metzendorf prepared negative evaluations to retaliate against her for her involvement in the prior discrimination lawsuit, and that such action violated Title VII of the 1964 Civil Rights Act. *See* 42 U.S.C. § 2000e–3(a).

In June 1993 Donato filed an amended complaint that included two causes of action. She again contended that the District's negative evaluations and subsequent termination constituted a course of retaliatory conduct to punish her for opposing its unlawful maternity leave policy. But she added a cause of action alleging that the District's termination of her employment without a hearing violated rights guaranteed by the Constitution's Fourteenth Amendment and claimed that her civil rights had been violated under 42 U.S.C. § 1983. She sought a permanent injunction against further discrimination, a total of $4 million in actual and punitive damages, and attorneys' fees pursuant to 42 U.S.C. § 2000e–5(k).

In her complaint, Donato disputed the truth and accuracy of the several Metzendorf memoranda and described Grishman's statement of reasons for her termination as filled with "intentional fabrications." Plaintiff contended that the defendants had taken these actions in an effort to damage her professional career. She refuted the District's charges against her by pointing to her many years of satisfactory service as a teacher and chairperson, her contributions to the school curriculum, and the various educational awards she had received.

When plaintiff moved for summary judgment on her due process claim, the district court denied it and instead dismissed that cause of action without an opinion. Later, the court presided over a bench trial to decide the retaliatory discharge cause of action. Plaintiff testified on her own behalf and called three witnesses—Robert Goldstein, Benjamin Taubenfeld, and Mario Colleluori. Goldstein, another school official, testified about the September 1992 meeting in which Metzendorf purportedly stated that unless he disparaged Donato's work, the Board would "chop [his] legs off." Taubenfeld testified as a hostile witness. He served as a Board member during most of the 20 years before trial, including the time when the Board dismissed Donato. Donato asked him questions about certain telephone conversations she had with him. When Taubenfeld failed to remember them, Donato played tape recordings of the conversations. In the recordings, Taubenfeld agreed with Donato's assertion that Metzendorf was "falsifying statements." Taubenfeld also commented that "[e]verything that goes on here [at the school] is phoney as the day is long," and he blamed Ginger Lieberman and Anna Goidell, two other Board members, for the deception. Colleluori, another Board member, testified briefly but added nothing to Donato's case.

After plaintiff rested, the defendants moved to dismiss the retaliatory dismissal claim, arguing that plaintiff failed to show a connection between her firing and her participation in the maternity leave lawsuit. The district court granted the motion with the following explanation: "I find there's no believable evidence in this case of retaliation. I believe the plaintiff has misstated, has done so many improper things in this case she is unworthy of belief. And as the finder of fact, I find insufficient evidence to allow this case to go any further. Dismissed."

With both causes of action in plaintiff's complaint now dismissed, the district court entered final judgment on August 7, 1995. Donato appeals from the dismissal of her due process claim and her retaliatory discharge claim.

## DISCUSSION

Donato contends on appeal that the District deprived her of property and liberty without due process of law, in violation of the Due Process Clause of the Fourteenth Amendment. Our inquiry begins not by looking to the weight of plaintiff's interest in her probationary position and her reputation, but to the nature of that interest. We must determine whether the challenged state action infringed a protected constitutional right

which plaintiff had. If the interest she asserts is not of a constitutional dimension, i.e., not a protected property or liberty interest, then her arguments must fail. *See Board of Regents v. Roth,* 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972).

## I  Property Interest

Plaintiff first asserts the loss of a protected property interest. Although the Constitution protects property interests, it does not create them. Rather, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. State law therefore guides us in deciding whether plaintiff possessed only an unprotected unilateral expectation of employment, or instead had a constitutionally-protected "legitimate claim of entitlement." *Id.; see also Martz v. Incorporated Village of Valley Stream,* 22 F.3d 26, 29–30 (2d Cir.1994).

Plaintiff's hiring notice clearly described her appointment as probationary under the Education Law of New York. State law provides that administrators are appointed "for a probationary period of three years." N.Y. Educ. Law § 3012(1)(b) (McKinney 1995). The statute adds that "[t]he service of a person appointed ... may be discontinued at any time during the probationary period on the recommendation of the superintendent of schools, by a majority vote of the board of education." *Id.* When a superintendent recommends to the board of education that a probationary employee be denied tenure or terminated, the employee must be notified of this recommendation and given, if she requests, a written statement of reasons and an opportunity to file a written response within seven days of the board meeting. N.Y. Educ. Law § 3031 (McKinney 1995). Although § 3031 did not extend to administrative personnel when the Board dismissed Donato, *see Robinson v. Bruni,* 193 A.D.2d 1072, 598 N.Y.S.2d 625 (4th Dep't 1993); 1993 N.Y. Laws ch. 691 (inserting references to supervisors and administra-

tors), plaintiff nonetheless received a written statement of reasons for her termination.

Hence, New York law provided no basis for Donato to believe that she had a legitimate claim of entitlement to continued employment as an assistant principal. Rather, the law expressly permitted her termination at any time during her probationary period. Appellant maintains that because her notice of appointment stated she would be eligible for tenure on September 1, 1994, the agreement implied that she would be allowed to complete her three years of probationary employment. This argument has no merit because § 3012 expressly states that a probationary appointee may be terminated at any time. The very nature of a probationary appointment—as the term itself implies—is that employment may be terminated should the employer be dissatisfied.

Moreover, plaintiff can point to no District "policies and practices," *Perry v. Sindermann,* 408 U.S. 593, 603, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972), sufficient to create an implied understanding that the express terms of § 3012 are somehow inapplicable. Nor can she plausibly urge that the District's previous decisions to grant her tenure in her roles as teacher and department chairperson "carry over" to create a legitimate expectation of an implied form of tenure as assistant principal. These prior years of service were in different positions, and state law generally does not allow nonqualifying service to create tenure. *See Yanoff v. Commissioner of Educ.,* 66 A.D.2d 919, 920, 410 N.Y.S.2d 713 (3d Dep't 1978), *appeal denied,* 47 N.Y.2d 711, 420 N.Y.S.2d 1024, 394 N.E.2d 294 (1979).

Appellant correctly points out that § 3012 does not give the Board *carte blanche* to fire her for any reason at all. For example, a discharge motivated by an unconstitutional reason, such as racial animus or religious bigotry, would be impermissible whatever the terms of her employment. *See Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 898, 81 S.Ct. 1743, 1750, 6 L.Ed.2d 1230 (1961). But these constitutional constraints on the Board's discretion do not create a property interest for plaintiff in

her probationary position as assistant principal.

■ Nor do Donato's financial need or the longevity of her service give her an interest in continuing employment. In the absence of a state-law entitlement to her position, these more "abstract" concerns do not constitute a property interest. *Roth,* 408 U.S. at 578, 92 S.Ct. at 2709. Appellant's reliance on *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), can give her no comfort. Loudermill was a "classified civil service employee" who could not be removed without good cause. *Id.* at 538–39 & n. 4, 105 S.Ct. at 1491 & n. 4. Ruling that this constituted a form of tenure, as the state employer initially conceded, the Supreme Court ultimately concluded that Loudermill had a property interest in his position. *Id.* at 539 & n. 5, 105 S.Ct. at 1491 & n. 5. Because Donato lacked tenure, *Loudermill* provides her no help. For all these reasons, we reject plaintiff's argument that the Board's action deprived her of a constitutionally-protected property interest.

## II   Liberty Interest

### A. *Constitutional Background*

■ Having disposed of plaintiff's property interest claim, we turn our attention to her claim that her discharge deprived her of liberty without due process of law. Liberty, as enshrined in the Fourteenth Amendment, is a "broad" notion, *Roth,* 408 U.S. at 572, 92 S.Ct. at 2706, and one of the many freedoms it encompasses is the freedom "to engage in any of the common occupations of life," *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). Under some circumstances, a state's refusal to rehire an employee implicates the employee's liberty interests. *See Roth,* 408 U.S. at 573, 92 S.Ct. at 2707.

■ However, as understood by the Fourteenth Amendment, a decision not to reemploy, standing alone, does not deprive an employee of liberty. *Id.* at 575, 92 S.Ct. at 2708. Special aggravating circumstances are needed to implicate a liberty interest. For instance, when the state fires an employee and publicly charges that she acted dis-

honestly or immorally, due process guarantees the employee an opportunity to defend her "good name, reputation, honor or integrity." *Id.* at 573, 92 S.Ct. at 2707 (quoting *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971)). A free-standing defamatory statement made by a state official about an employee is not a constitutional deprivation. Instead, it is properly viewed as a state tort of defamation. But a defamatory statement about an employee implicates a liberty interest when it is made during the course of that employee's termination from employment. *See Paul v. Davis,* 424 U.S. 693, 709–10, 96 S.Ct. 1155, 1164–65, 47 L.Ed.2d 405 (1976); *Martz,* 22 F.3d at 32 ("concurrent temporal link between the defamation and the dismissal is necessary" to claim a deprivation of liberty); *Easton v. Sundram,* 947 F.2d 1011, 1016 (2d Cir.1991) (requiring "stigma plus"), *cert. denied,* 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992).

■ Stigmatizing comments may include matters other than charges of illegality, dishonesty, or immorality. *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 446 n. 4 (2d Cir.1980). The test of whether a state employer's decision not to rehire an employee denies that employee due process is met when it deprives her of the "freedom to take advantage of other employment opportunities." *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707. An employee charged with derelictions largely within her own power to correct is not deprived of such an interest. *See Russell v. Hodges,* 470 F.2d 212, 217 (2d Cir.1972) (Friendly, J.). By contrast, a government announcement that it has fired an employee for incompetence or because she can no longer do the job is " 'considerably graver' and carries more potential for future disqualification from employment than a statement that the individual performed a job poorly." *O'Neill v. City of Auburn,* 23 F.3d 685, 692 (2d Cir.1994).

■ Yet, even governmental allegations of professional incompetence do not implicate a liberty interest in every instance. Such allegations will support a right to a name-clearing hearing only when they denigrate

the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession. *Id.* at 692–93. *Huntley v. Community Sch. Bd.*, 543 F.2d 979 (2d Cir.1976), *cert. denied*, 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 773 (1977), is instructive. Huntley was the acting principal of an intermediate school in Brooklyn. Upon terminating his employment, the local school board released a statement of charges against him that included the following remarks

> Mr. Huntley has ... failed to demonstrate that quality of professional leadership necessary to effectively deal with the educational program at [the school]....

> [He] has not been able to implement an effective educational program. He has demonstrated an inability to provide the necessary leadership in working with a staff of professional teachers and supervisors. He has not provided for the basic safety of the children and staff of the school. He has failed to maintain a reasonably functional educational plant that is conducive to an effective learning environment.

> [He] has not effectively resolved problems that occurred in the administration and supervision of the school....

> The leadership of Mr. Huntley ... has created a climate of confusion and discontent in the school. The educational climate ... is now one of general disorder thus depriving many children of a proper and effective learning situation.

*Id.* at 982 n. 4.

Huntley sued alleging that the board had deprived him of liberty without due process of law. On appeal, we explained that "[h]aving discharged Huntley with a public statement of these charges, it is unlikely that Huntley would ever have a chance to obtain another supervisory position—in the public schools or elsewhere." *Id.* at 985. Because the superintendent's comments "[went] to the very heart of Huntley's professional competence" and "drastically impaired" his chance of receiving another supervisory posi-

tion, we held that the board's actions implicated a liberty interest. *Id.*

### B. Liberty Interest In Instant Case

■ The similarities between *Huntley* and the instant case are striking. Both discharged supervisors received strongly negative evaluations of their skills in the areas of discipline, staff relations, educational and instructional supervision, administrative responsibilities, and leadership. In each case, the statement of reasons for termination reads like a bill of indictment, methodically reciting a litany of lack of professional competence. Taken together, we think the comments in the instant case are so harsh as to be likely to persuade any other school board not to hire plaintiff as a supervisor.

Decisional law bolsters Donato's contention that her termination implicated a liberty interest. In *Baden v. Koch*, 799 F.2d 825, 827, 831 (2d Cir.1986), the Chief Medical Examiner of New York City was demoted one level to the position of Deputy amidst negative public comment concerning his ability. We held that this demotion may have implicated a "weak liberty interest." *Id.* at 831. Here, Donato was not simply demoted—she was fired by her employer of 28 years. Although *O'Neill*, 23 F.3d at 693, explained that "vague statements of unspecified 'incompetence'" would not harm an employee's professional reputation so as to require a hearing, the Metzendorf evaluations and the District's statement of reasons for Donato's discharge are not vague statements of incompetence. They are extensively detailed lists of her supposed professional failings.

■ Appellant also satisfies the other requirements for stating a liberty interest. Stigmatizing statements by the government about an employee upon her discharge only implicate a liberty interest when there is also public disclosure. *See Bishop v. Wood*, 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976); *see also Loudermill*, 470 U.S. at 547 n. 13, 105 S.Ct. at 1496 n. 13 (upholding dismissal of a liberty claim due to absence of publication). This requirement is "satisfied where the stigmatizing charges are placed in the discharged employee's personnel file and are likely to be disclosed to prospective em-

ployers." *Brandt v. Board of Coop. Educ. Servs.*, 820 F.2d 41, 45 (2d Cir.1987); *see also Velger v. Cawley*, 525 F.2d 334, 336 (2d Cir. 1975), *rev'd on other grounds sub nom. Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). We have recognized, in fact, that this is the very action that circulates the stigmatization. *Valmonte v. Bane*, 18 F.3d 992, 1000 (2d Cir.1994). Potential future employers undoubtedly will consult plaintiff's prior employer when she applies for supervisory positions. *See Velger*, 525 F.2d at 336 (job applicants usually required to disclose personnel files to prospective employers). Appellant also strongly disputes the accuracy of the District's comments, another showing required for a plaintiff to state a liberty claim. *See Codd*, 429 U.S. at 627, 97 S.Ct. at 883.

Defendants argue that even though the circumstances surrounding plaintiff's termination may make it more difficult for her to find employment as a supervisor, she remains free to seek another type of employment. Quite the contrary. As we made clear in *Huntley*, 543 F.2d at 985, a significant difference exists between a teaching and a supervisory position. It is of little consequence to our analysis that appellant is not foreclosed from finding employment in some other line of work outside the education field. Due process protects the freedom "to engage in *any* of the common occupations of life." *Meyer*, 262 U.S. at 399, 43 S.Ct. at 626 (emphasis supplied).

Defendants also contend that an employee is only deprived of a liberty interest when the government "allege[s] some charge of moral turpitude." Such accusations obviously can form the basis for a liberty claim. *See, e.g., Brandt*, 820 F.2d at 42 (accusations that a teacher sexually abused autistic children); *Velger*, 525 F.2d at 336 (allegations that police officer threatened to commit suicide). Nonetheless, stigmatizing allegations also include charges going to professional competence when the charges are sufficiently serious. *See O'Neill*, 23 F.3d at 692–93; *Quinn*, 613 F.2d at 446 n. 4; *Huntley*, 543 F.2d at 985. Donato's dismissal is far more stigmatizing than those of other public employees whose claims have failed. *See, e.g.,*

*Roth*, 408 U.S. at 568, 574 & n. 13, 92 S.Ct. at 2704, 2707 & n. 13 (dismissal of employee without any statement of reasons only hypothetically affects future employment prospects); *Russell*, 470 F.2d at 215 n. 2, 217 (rejecting claims by employees terminated for no stated reason, due to a knee injury, or due to absenteeism and incorrect clothing respectively).

The presence or absence of a literal charge of incompetence is not dispositive of the question before us. *Compare Huntley*, 543 F.2d at 982 n. 4, 985 (specific allegations amounted to charge of incompetence and implicated liberty interest though the word "incompetence" not used by employer) *with O'Neill*, 23 F.3d at 692–93 (explicit charge of "incompetence" was too vague to implicate liberty interest). We look to the substance of the employer's comments when viewed as a whole rather than to any label attached to them.

It could be argued that because N.Y. Educ. Law § 3031 requires that school districts provide a statement of reasons for termination (upon an employee's request), our decision puts state employers in a daunting dilemma between the Due Process Clause and state law, and that the public employer might be said to be like Odysseus, trapped between the six-headed monster, Skylla, and the destructive whirlpool Charybdis. *See* Homer, *The Odyssey* 185–92 (Richmond Lattimore trans., Harper & Row 1967). We do not subscribe to that view. A law like § 3031, which requires the government to explain its reasons for termination, is beneficial to both the employee and the public alike. After all, a constitutional rule that strongly discourages the government from providing its employees with the reasons for their dismissal for fear they will be held stigmatizing might, in the long run, harm more workers than it helped. *See Russell*, 470 F.2d at 217.

In most cases a state employer's criticism will not be so stigmatizing as to foreclose the employee's freedom to seek other employment. Moreover, constitutional interpretation cannot be guided simply by what is efficacious—we must ask whether a given government action is constitutional. *See*

Laurence H. Tribe, *Taking Text and Structure Seriously: Reflections on Free–Form Method in Constitutional Interpretation,* 108 Harv. L.Rev. 1223, 1302 (1995). When the state makes stigmatizing allegations in the course of dismissing an employee, such action implicates the protections of the Fourteenth Amendment, and we must enforce the Constitution even when the state is perhaps thereby burdened by having to recalibrate its employment practices.

Here, the accusations made against Donato go to the heart of her professional competence and damage her professional reputation to such an extent as to severely impede her ability to continue in the education field in a supervisory capacity. As a consequence, the defendant District deprived plaintiff of a liberty interest.

### C. Remedy

■ Because plaintiff was deprived of liberty without due process of law, we now consider what process is due. Since due process is a flexible notion, the procedural protection accorded a constitutional interest is determined by reference to the particular circumstances of a given case. *See Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976).

■ The Supreme Court teaches that when a government employee is dismissed for stigmatizing reasons that seriously imperil the opportunity to acquire future employment, the employee is entitled to "an opportunity to refute the charge." *Roth,* 408 U.S. at 573 & n. 12, 92 S.Ct. at 2707 & n. 12; *see also Codd,* 429 U.S. at 627, 97 S.Ct. at 883; *Baden,* 799 F.2d at 832. A hearing must be held for the limited purpose of giving a discharged employee an opportunity to clear her name. A name-clearing hearing significantly reduces the risk that an employee will be dismissed with false stigmatizing charges placed in her personnel file. Even if § 3031 had provided Donato an opportunity to present written comments, such a remedy is insufficient under *Roth* and *Codd* to satisfy the requirement of a name-clearing hearing.

■ The employer need not rehire the employee even if she can prove the inaccuracy of the stigmatizing allegations. *See Roth,* 408 U.S. at 573 n. 12, 92 S.Ct. at 2707 n. 12.. But, when and if the allegations are shown to be false, their removal from the employee's file restores her freedom to seek future employment. Donato did not receive a name-clearing hearing. The district court, on remand, should ensure that such a hearing is accorded her. The task of directing the fair hearing is confided in the district court and that hearing must of course conform to the requirements of due process. *See Goldberg v. Kelly,* 397 U.S. 254, 266–71, 90 S.Ct. 1011, 1019–22, 25 L.Ed.2d 287 (discussing "fair hearing" requirements). Should the charges be proven false, the district court should consider the factual and legal merits of Donato's claim for damages, a subject we do not reach or address. If the reasons for termination are shown to be accurate, that ends the matter.

### III Retaliatory Discharge

■ The plaintiff's retaliatory discharge claim was tried before the district court sitting without a jury. After plaintiff rested, her claim was dismissed due to insufficient evidence of retaliation. The trial court explained as the finder of fact that plaintiff "has misstated, has done so many improper things in this case she is unworthy of belief." On appeal, plaintiff contends that she proved a *prima facie* case of retaliatory discharge, and that her claim was wrongly dismissed.

Retaliatory discharge claims may be based upon Title VII of the Civil Rights Act of 1964, which makes it unlawful for an employer to discriminate against an employee for opposing an employment practice that violates the Act, *see* 42 U.S.C. § 2000e–3(a) (1994). Such claims are analyzed under the three-step burden shifting approach originally explained in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir. 1995).

■ To establish a *prima facie* case of retaliatory discharge, the plaintiff must show: "i) [her] participation in a protected activity known to the defendant; ii) an employment action disadvantaging the plaintiff;

and iii) a causal connection between the protected activity and the adverse employment action." *Id.*; *see also Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991). At this stage, plaintiff's burden is *de minimis. Tomka,* 66 F.3d at 1308. Once a *prima facie* case is made out, the burden shifts to defendant to demonstrate a legitimate nondiscriminatory reason for its decision. If such a reason is articulated, plaintiff must then prove that the proffered reason was a pretext for retaliation and that defendant's real motivation was the impermissible retaliatory motive. *Id.*

Here, Donato established both her participation in a protected activity (the maternity leave litigation) and the adverse employment action (her discharge). The contested issue therefore was whether plaintiff adduced sufficient evidence to prove a causal connection between these two events. Appellant presented some evidence that could be construed as pointing to a causal connection, such as the obvious rancor surrounding the contentious litigation, Metzendorf's rationalization that the Board threatened to chop off his legs if he did not discredit plaintiff, and the tape-recorded phone conversation in which Taubenfeld told Donato of the Board's enmity toward her. But the district court rejected the plaintiff's evidence as not "believable."

■ Fed.R.Civ.P. 52(a) provides that "[f]indings of fact ... shall not be set aside unless clearly erroneous" and further states that "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." The Supreme Court instructs that "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Further, we must accord great deference to the trial court's findings regarding credibility because the trial judge is in the best position to evaluate a witness's demeanor and tone of voice as well as other mannerisms that bear heavily on

one's belief in what the witness says. *Id.* at 575, 105 S.Ct. at 1512.

In this case, which turned largely on the believability of the plaintiff and her assertions, the district court was in the best position to determine the credibility of plaintiff and her witnesses. Because no documents or objective evidence support Donato's claim of retaliation, the trial court naturally based its decision regarding causation on witness credibility. As we lack a "definite and firm conviction that a mistake has been committed," *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), we cannot describe the district court's factual findings as clearly erroneous. Having found that plaintiff presented no credible evidence of a causal connection between her involvement in the maternity leave litigation and her loss of employment, the district court properly dismissed plaintiff's retaliatory discharge action.

Finally, appellant contends that the district court failed adequately to "set forth the findings of fact and conclusions of law which constitute the grounds of its action." Fed. R.Civ.P. 52(a). She asks that we vacate the order and remand with instructions to develop adequate findings, our customary practice when a district court's findings are so insufficient that they defy appellate review. *See Tekkno Labs., Inc. v. Perales,* 933 F.2d 1093, 1097 (2d Cir.1991). However, Rule 52(a) also explicitly provides that a trial court may read into the record its findings of fact and conclusions of law. That is what was done here, and although the court's decision was brief, we are not uncertain of the basis for its decision. Hence, a remand for more detailed findings is not necessary.

## CONCLUSION

Consequently, we affirm the judgment of the district court insofar as it dismissed plaintiff's retaliatory termination from employment claim, and we affirm the dismissal of the due process cause of action insofar as it related to the alleged deprivation of a property interest. We reverse the judgment insofar as it dismissed plaintiff's due process claim alleging a deprivation of a liberty inter-

est, and we remand for the district court to order a name-clearing hearing and for further proceedings not inconsistent with this opinion.

ALTIMARI, Circuit Judge, concurring in part and dissenting in part.

I vote to affirm the judgment of the district court in full.

I concur in the majority's decision, except with respect to Donato's alleged liberty interest. I firmly believe that this Court has gone too far. The due process clause of the Fourteenth Amendment was not intended to protect probationary employees against negative job evaluations. Accordingly, I must dissent with the majority's decision to the extent that the liberty interest determination can be read broadly to grant a due process right to all those public employees who are dismissed with negative job evaluations.

The majority suggests that the outcome regarding Donato's alleged liberty interest is dictated by *Huntley v. Community Sch. Bd.*, 543 F.2d 979 (2d Cir.1976). I cannot agree. The Court in *Huntley* stated that a liberty interest arises when a public employee is faced with such an overwhelmingly negative job evaluation as to go to "the very heart of [that employee's] professional competence." *Id.* at 985. As the Court concluded in *Huntley*, "it [was] abundantly clear that Huntley's chances of obtaining a supervisory position in the public school system [had] been drastically impaired." *Id.* While Donato's job evaluation was by no means laudatory, her future supervisory employment was not foreclosed to the same degree as was Huntley's.

Unlike the broad-based condemnation of Huntley's performance, Donato's evaluation was of a different character. Huntley's job failures were broadly stated and encompassed the whole range of professional tasks associated with any supervisory position in the public school system. Donato's alleged failures, on the other hand, can in large part be summarized by the final stated reason for her termination—"[i]neffective commitment *to the Middle School.*" (emphasis added). As such, while Donato's evaluation is unlikely to assist her in acquiring a future supervisory position, much of Donato's reputed job failure concerned her professional inefficacy at the middle school level and is unlikely to foreclose the possibility of a supervisory position at some other level. *Compare O'Neill v. City of Auburn,* 23 F.3d 685, 691 (2d Cir. 1994) (defendant had been described by employer generally as "incompetent"); *Huntley,* 543 F.2d at 985 (Board's publicly announced charges of incompetence went "to the very heart of Huntley's professional competence" and "drastically impaired" his chances of receiving another supervisory position "*in the public schools or elsewhere.*") (emphasis added).

Finally, I firmly believe that, if read expansively, the majority's discussion of Donato's liberty interest will place school districts in a difficult position. When faced with a probationary employee who performs below expectations, school districts will be reluctant to state all of that employee's shortcomings, for fear of triggering a liberty interest. While such an observation clearly should not dictate the outcome of our constitutional analysis, it is illustrative of why the majority has set the threshold too low for those "stigmatizing allegations" that implicate the fourteenth amendment. A probationary employee's negative job evaluation must clearly foreclose any and all employment in that employee's chosen field before a liberty right comes into play. No such interest is implicated here.