2006 VT 83

## Dr. Ebaristo "Abe" Herrera v. Union No. 39 School District and James Van Hoof

[917 A.2d 923]

No. 05-204

Present: **Reiber, C.J., Johnson, Skoglund and Burgess, JJ., and Martin, Supr. J. (Ret.), Specially Assigned**

Opinion Filed August 4, 2006
Motion for Reargument Denied December 19, 2006

*Michael Marks* of *Tarrant, Marks & Gillies*, Montpelier, for Plaintiff-Appellant.

*Kaveh S. Shahi* of *Cleary Shahi & Aicher, P.C.*, Rutland, for Defendants-Appellees.

¶ 1. **Johnson, J.** This appeal arises out of an employment dispute between plaintiff Dr. Ebaristo Herrera, former principal of Black River Union High School, and defendants Union No. 39 School District and Dr. James Van Hoof, the District's superintendent. Plaintiff appeals from the superior court's grant of summary judgment in favor of defendants. Plaintiff contends the court erred by concluding that the District's decision to place him on paid administrative leave for the remainder of his term of employment without a hearing did not breach plaintiff's employment contract or deprive him of a protected property or liberty interest without due process of law. We reverse in part and remand.

¶ 2. The superior court determined that the following facts are undisputed. See V.R.C.P. 56(c)(2) ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."). In 2000, plaintiff was hired by the District to serve as principal of Black River Union High School in Ludlow, Vermont. Plaintiff's employment contract provided for a two-year term, beginning July 1, 2000, and continuing through June 30, 2002. The contract also provided that plaintiff would be notified in writing whether his contract would be renewed for the next school year, and that "[s]hould the [District's school board] choose not to re-employ [plaintiff] for said year, or should the Board suspend or dismiss

[plaintiff] during the term of this Agreement, [plaintiff] shall be entitled to appeal such action pursuant to [16 V.S.A. § 243]."

¶ 3. In February 2001, the relationship between plaintiff and Dr. Van Hoof began to deteriorate, based at least in part on accusations by Dr. Van Hoof regarding plaintiff's job performance. In the spring of 2001, Dr. Van Hoof asked the District's school board to terminate plaintiff's employment, but the board decided not to do so after members of plaintiff's staff and the community showed support for plaintiff at a public meeting.

¶ 4. In the fall of 2001, Dr. Van Hoof again began accusing plaintiff of poor job performance, issuing several negative reports on his performance. On November 9, 2001, Dr. Van Hoof compiled these reports into a single evaluation, which he provided to the board. On November 28, plaintiff met with the board to discuss this evaluation. At that meeting, the board invited plaintiff and Dr. Van Hoof into an executive session, where the board, plaintiff, and Dr. Van Hoof briefly discussed Dr. Van Hoof's evaluation of plaintiff. The board then presented plaintiff with a document entitled "Settlement and Release Agreement," along with a copy of plaintiff's employment contract and a copy of 16 V.S.A. § 243, the statute governing the employment of school principals. The board gave plaintiff the choice of resigning, pursuant to the agreement, with full pay and benefits, or facing immediate termination. Plaintiff did not respond to the request for his resignation, and the board informed him that he would be placed on administrative leave until the board received his response. The board ordered plaintiff not to talk to anyone but his immediate family, his attorney, and his financial advisor about the proposed agreement or the decision to place him on administrative leave.

¶ 5. On December 19, 2001, the board met again and voted to place plaintiff on paid administrative leave for the remainder of the 2001-02 school year. It also voted not to renew plaintiff's employment contract. Neither issue was part of the board's agenda. The board's decision appeared in an article in the December 20 edition of the Rutland Herald, under the headline, "BRHS principal is fired by the Board; Personnel evaluation is cited." The article stated that the board had made its decision on the basis of Dr. Van Hoof's evaluation of plaintiff's performance, but also based on "potentially costly and damaging reasons" that were "not fit for public review." The article quoted board member John Perry as saying that revealing the true reasons for the board's actions would be "doing a great disservice." Perry said that by doing so, he "would be putting the taxpayers in jeopardy. . . . It is

incredibly frustrating not to be able to stand up and tell you why I [voted to fire [plaintiff]). You all would pay for it." Dr. Van Hoof was quoted in the article as saying, "For [plaintiff] to sit there and lead people to believe that he doesn't know why he's at this point, that's ridiculous."

¶ 6. On December 20, the board sent plaintiff two letters formally informing him of its actions. The first letter stated that the board had voted to place him on "a paid leave of absence for the remainder of the 2001/02 school year," during which he would be "relieved of all duties, responsibilities and authority." The second letter stated that the board had voted not to renew plaintiff's contract for the 2002-03 school year, "based upon the performance deficiencies as set forth in the Superintendent's November 9, 2001 performance evaluation." The letter continued:

> As provided by your Employment Contract and state statute, you have fifteen (15) calendar days from the delivery of this letter to request a meeting with the School Board concerning the non-renewal. If you request such a meeting, you will be allowed to "present written information or oral information through statements of others and you may be represented by counsel." If you request such a meeting, it will be held in executive session unless both you and the Board agree to hold the matter in public. After such a meeting, the School Board shall decide whether or not to offer you an opportunity to renew your contract and any such decision by the Board shall be final.

Plaintiff responded with a written request for a public hearing and meeting regarding both the decision to place him on administrative leave and the decision not to renew the contract. The board agreed to schedule a hearing for January 11, 2002, on the nonrenewal of plaintiff's contract, but declined to engage in any further consideration of its decision to place plaintiff on leave, explaining that "[n]othing in your contract or 16 V.S.A. § 243 provides for a challenge to such an action. As such, we will not be dealing with this issue at the January 11 meeting."

¶ 7. On January 11, 2002, the board met with plaintiff to reconsider its nonrenewal of plaintiff's contract. The meeting was not public. At the meeting, plaintiff presented witnesses and submitted documents rebutting some of the allegations in Dr. Van Hoof's evaluation. On

January 16, the board notified plaintiff in writing that his contract still would not be renewed. After receiving this letter, plaintiff sought employment with other school districts, including districts in other states, but was unsuccessful. He alleges he lost one job opportunity when a local newspaper republished a report about the board's decision to place him on administrative leave.

¶ 8. In May 2003, plaintiff brought an action in the superior court. His complaint alleged that defendants: (1) deprived him of due process under color of state law under 42 U.S.C. § 1983; (2) violated his employment contract and his statutory rights as a principal; (3) committed defamation; and (4) discriminated against him on the basis of race in violation of the Vermont Fair Employment Practices Act. The complaint also contained a request for punitive damages and attorneys' fees. Defendants moved for summary judgment on all counts. The court granted defendants' motion in part, entering judgment in defendants' favor on the due process and contractual claims. It concluded that the January 11, 2002 board meeting satisfied the demands of due process, and that the District was not contractually or statutorily required to provide plaintiff with a hearing specific to its decision to place plaintiff on administrative leave. The court denied summary judgment on the defamation and discrimination claims. These claims were tried before a jury; the jury found in favor of defendants on both counts. This appeal followed.

¶ 9. On appeal, plaintiff does not challenge the jury's verdict. Instead, he contends the superior court erred by granting summary judgment on the first two counts of his complaint. We review a trial court's decision on summary judgment according to the same standard as the trial court. *In re Estate of Kurrelmeyer*, 2006 VT 19, ¶ 7, 179 Vt. 359, 895 A.2d 207. "Summary judgment is appropriate where the undisputed facts demonstrate either party is entitled to judgment as a matter of law." *Id.* (citing V.R.C.P. 56(c)(3)). For the reasons stated below, we agree that the court was incorrect in granting summary judgment to defendants on plaintiff's breach-of-contract and § 1983 claims. We thus reverse the court's judgment in part and remand for further proceedings.

## I. Breach of Contract

¶ 10. We first address plaintiff's claim that the District breached his employment contract by denying him the procedural protections of 16 V.S.A. § 243 before terminating his employment. The undisputed facts establish that the District took actions that were tantamount to a mid-

year dismissal of plaintiff from his position as principal. Such a dismissal was not permitted under plaintiff's contract without a hearing and a written decision establishing just cause for the dismissal. Thus, as a matter of law, the District's actions breached plaintiff's employment contract. We reverse the superior court's ruling on summary judgment and remand so that the superior court may determine plaintiff's damages.

¶ 11. Plaintiff's employment contract provided that, "should the Board suspend or dismiss [plaintiff] during the term of this Agreement, [plaintiff] shall be entitled to appeal such action pursuant to [16 V.S.A. § 243]." This clause incorporated by reference 16 V.S.A. § 243, which governs the appointment and dismissal of school principals. Section 243 provides for two methods for ending the employment of a principal: nonrenewal, under § 243(c); and dismissal, under § 243(d). The two methods are accomplished using two quite different sets of procedures. When a district decides not to renew a principal's contract, it must notify the principal in writing at least 90 days prior to the expiration of the contract. 16 V.S.A. § 243(c). The writing must "recite the grounds for nonrenewal," but the grounds available to the district are flexible, and can include "elimination of the position, performance deficiencies or other reasons." *Id.* Within fifteen days of receiving this notice, the principal whose contract is not being renewed may request "a meeting with the school board." *Id.* This triggers the following procedures:

> At the meeting the school board shall explain its position, and the principal shall be allowed to respond. The principal and any member of the board may present written information or oral information through statements of others, and the principal and the board may be represented by counsel. The meeting shall be in executive session unless both parties agree in writing that it be open to the public. After the meeting, the school board shall decide whether or not to offer the principal an opportunity to renew his or her contract. The school board shall issue its decision in writing within five days. *The decision of the school board shall be final.*

*Id.* (emphasis added). These are the procedures to which the board referred when it agreed to hold the January 11, 2002 meeting regarding the nonrenewal of plaintiff's contract.

¶ 12. The procedural protections § 243 provides against a dismissal during the term of a principal's contract are substantially stronger than

those against nonrenewal of the principal's contract. Section 243(d) provides:

> **Dismissal.** During the term of a contract, a principal may be dismissed by the board *for just and sufficient cause* by written notice setting forth the grounds therefor. The board may provide that its order shall take effect immediately, or following a hearing. In either case, the principal shall be given an opportunity to request in writing *a hearing* within the 15 days following delivery of the notice. Within 15 days following receipt of a request for hearing from the principal, the board shall conduct such a hearing. The clerk of the board shall advise the principal and the superintendent of the time and place of hearing by written notice at least five days before the date of the hearing. The hearing shall be in executive session unless both parties agree in writing that it be open to the public. *The principal and any member of the board may present witnesses and written evidence and cross-examine witnesses,* and the principal and the board may be represented by counsel. Either the principal or the school board may arrange for the taking of a verbatim record of the proceedings. After the hearing, the board shall affirm, modify or reverse its earlier action. Within five days after the conclusion of evidence in the case, *the board shall issue a written decision which includes findings of fact and conclusions of law.* Within 30 days of the day the written decision is delivered, *the principal may appeal to the superior court under the rules for appeals from decisions in contested cases.*

16 V.S.A. § 243(d) (emphasis added). As opposed to the "meeting" that follows a preliminary nonrenewal decision, a principal is entitled to a "hearing" before or after dismissal, where both sides may cross-examine witnesses regarding the existence of "just and sufficient cause." *Id.* Perhaps most importantly, the written decision required after such a dismissal hearing, in contrast to the written decision that follows a nonrenewal meeting, must include "findings of fact and conclusions of law," and the board's decision is subject to superior court review. *Id.* Thus, by waiting until the end of a contract term to end a principal's employment, a school district can act on less substantial grounds, avoid a formal hearing that includes the cross-examination of witnesses, findings of fact, and conclusions of law, and issue a final decision that is not subject to superior court review.

¶ 13. The District provided only the process applicable to a nonrenewal, and explicitly refused to hold the type of hearing that would accompany a dismissal. Thus, we must decide whether the District's decision to place plaintiff on paid administrative leave triggered the same procedural protections as a decision to dismiss him. If so, the District's failure to provide a § 243(d) hearing breached plaintiff's contract.

¶ 14. Plaintiff presents two arguments for applying the protections of § 243(d) to the District's actions here. First, he argues that his employment contract entitled him to the same process regardless of whether he was suspended or dismissed. Second, he argues that suspending him for the remainder of his contract was effectively the same as dismissing him. We need not address the question of whether plaintiff was entitled to a § 243(d) hearing prior to a suspension, as we conclude that in this case plaintiff's suspension was tantamount to a dismissal.

¶ 15. Practically speaking, the District's course of action had the same effect as a dismissal: it ended plaintiff's employment relationship with the District in the middle of the school year. The labeling of this action as a "placement on administrative leave" instead of a "dismissal" does not exempt the District from the procedural requirements of plaintiff's contract and § 243(d). The only difference between plaintiff's administrative leave and a typical dismissal is that the District continued to provide plaintiff with pay and benefits while he was on administrative leave. This distinction is important, especially in determining whether an employee has a property interest for due process purposes, e.g., *infra*, ¶ 26, but it is not dispositive here. Section 243 does not limit the procedures applicable to the termination of a principal's employment based on the continuation of pay or benefits. Instead, the statute focuses on the timing of the termination. Thus, a dismissal entitles a principal to the procedures of § 243(d), provided it takes place "[d]uring the term of a contract." A "nonrenewal," which has the same effect on the principal's future employment with the district but is distinguished by its occurrence at the expiration of a contractual term, entitles the principal to the less rigorous procedural protections of § 243(c).

¶ 16. We will not read into the statute a definition of the word "dismissal" as "dismissal without pay." See *State v. O'Neill*, 165 Vt. 270, 275, 682 A.2d 943, 946 (1996) ("It is inappropriate to read into a statute something which is not there unless it is *necessary* in order to make the

statute effective."). Dismissals from employment can occur under a variety of circumstances; some may include severance pay, others may include a continuation of benefits, and many may include neither of these. All that can reasonably be implied from "dismissal" as it is used in § 243(d) is the termination of the employment relationship on the employer's terms. It is undisputed that the District intended to end plaintiff's employment prior to the expiration of his contract. The board gave plaintiff the choice between resignation and immediate termination, and when he refused to resign, its response was to place him on administrative leave. The board stated, in its letter to plaintiff describing the administrative leave arrangement, "It is the Board's view that this action will allow you the maximum possible time to secure alternative employment," and informed plaintiff that he was "relieved of all duties, responsibilities and authority." The board did not provide plaintiff with an opportunity to improve his performance or otherwise earn some continuation of his employment with the District once he was placed on administrative leave, and by its concurrent decision not to renew his contract, it ensured that its action was permanent. The District even went so far as to inform the State, when plaintiff sought unemployment benefits, that plaintiff had been fired. The District's action against plaintiff was not a suspension; it was a dismissal with pay during the term of plaintiff's contract. Section 243(d) thus entitled plaintiff to a formal hearing, with written findings and an opportunity to appeal the board's decision to the superior court.

¶ 17. Defendants argue that the superior court was nonetheless correct in granting them summary judgment on plaintiff's contractual claims because: (1) plaintiff failed to appeal to the superior court within the relevant time limits; (2) plaintiff received the process he was entitled to under § 243(d) at the meeting he had with the board on January 11, 2002; and (3) plaintiff was not entitled to damages for any breach of contract because he was paid in full through the end of his contract. We address these arguments in turn.

¶ 18. Defendants contend plaintiff lost his opportunity to appeal the board's decision to place him on administrative leave when he did not file his appeal with the superior court within the thirty-day limit imposed by § 243(d). See 16 V.S.A. § 243(d) ("Within 30 days of the day the written decision is delivered, the principal may appeal to the superior court under the rules for appeals from decisions in contested cases."). This argument is without merit on its face, as the board did not hold a hearing as required under § 243(d), and thus, did not issue a written decision pursuant to that section. The plain language of

§ 243(d) provides that the thirty-day time limit begins on "the day the written decision is delivered." *Id.* Without a written decision, no such time limit applies. Defendants argue in the alternative, however, that the time limitations of Vermont Rule of Civil Procedure 75 apply to limit plaintiff's right to appeal. Rule 75 provides for superior court review of administrative actions, and includes a thirty-day limitation for review "after notice of any action," except that, "in the event of a failure to act," a six-month limitations period applies. V.R.C.P. 75(c). If either limitation were applied to this appeal, plaintiff's complaint in the superior court would be untimely, as it was brought over a year after the board's dismissal of plaintiff. The superior court did not address this argument, as it decided against plaintiff on other grounds.

■ ¶ 19. We conclude that the time limitations of Rule 75 have no effect on this appeal. The statute of limitations and other avoidance defenses must be pled as affirmative defenses, or else they are waived. *Lillicrap v. Martin,* 156 Vt. 165, 170, 591 A.2d 41, 43 (1989) (citing V.R.C.P. 8(c)); see also *Fyles v. Schmidt,* 141 Vt. 419, 422, 449 A.2d 962, 964 (1982) (stating that Rule 75's time limitations are not jurisdictional). The only affirmative defense contained in defendants' pleadings was "16 V.S.A. section 243," without any explanation. The pleadings contained no statute-of-limitations argument in any form, whether under § 243(d) or Rule 75. Thus, plaintiff's action cannot be dismissed as untimely filed.

■ ¶ 20. Defendants' next argument is that the board's meeting with plaintiff on January 11, 2002, provided plaintiff with the process he was entitled to under his contract and § 243(d). We disagree. First, the procedures provided for under § 243(d), as we have discussed above, are very different from those provided for in § 243(c). See *supra,* ¶¶ 11-12 (noting, among other distinctions between § 243(d) and § 243(c), requirement of just cause, cross-examination of witnesses, written decision with findings of fact and conclusions of law, and right to appeal). More importantly for these purposes, the board limited the topic of the January 11 meeting to the subject of plaintiff's nonrenewal, stating, "[W]e will not be dealing with [the issue of administrative leave] at the January 11 meeting." We cannot conclude that a meeting on a different subject, conducted according to looser procedural requirements, measured according to a more deferential decision-making standard, and subject to less rigorous review, if any, was sufficient to excuse the District from providing the hearing plaintiff was

entitled to under his contract and the applicable statute. The District's failure to provide that hearing was a breach of plaintiff's contract.

■ ¶ 21. Defendants' final contention is that because the District paid plaintiff in full through the expiration of his contract, plaintiff cannot recover for any breach of the contract. This statement of the law is incorrect in several respects. First, plaintiff is entitled to at least nominal damages for the District's failure to provide him with the hearing required by his contract. See Restatement (Second) of Contracts § 346 (1981) (stating that if a breach of contract "caused no loss or if the amount of the loss is not proved . . . a small sum fixed without regard to the amount of loss will be awarded as nominal damages"). Courts do not typically reverse and remand solely for the purpose of awarding nominal damages, *id.* § 346 cmt. b, but as we are remanding for further proceedings on other grounds, entry of judgment for nominal damages will be appropriate on remand if no other damages are found.

■ ¶ 22. Second, plaintiff may be entitled to consequential damages resulting from defendants' breach. Damages for breach of contract generally fall into two categories: "losses that naturally and usually flow from the breach itself," and consequential damages. *A. Brown, Inc. v. Vt. Justin Corp.*, 148 Vt. 192, 195-96, 531 A.2d 899, 901 (1987). Consequential damages are appropriate when they may "be reasonably supposed to have been in the contemplation of both parties at the time they made the contract," and they satisfy the requirements of causation, certainty and foreseeability. *Id.* at 196, 531 A.2d at 901-02. Plaintiff did not suffer any immediate loss from defendants' breach, as he received his contractual pay and benefits, but he alleges that defendants' breach resulted in harm to his professional reputation and lost employment opportunities that, if proven, should be recoverable through consequential damages.

■ ¶ 23. Defendants correctly state that in wrongful discharge cases, harm to the discharged employee's reputation is ordinarily considered to be outside the range of reasonably foreseeable losses, and thus, damages are limited to lost wages and related economic damages. See, e.g., *Stancil v. Mergenthaler Linotype Co., a Div. of Eltra Corp.*, 589 F. Supp. 78, 85 (D. Haw. 1984) (adopting "the majority view that damages for injury to reputation are not properly awardable in a breach of contract suit"); *O'Leary v. Sterling Extruder Corp.*, 533 F. Supp. 1205, 1209 (E.D. Wis. 1982) ("The courts seem to be in general agreement that damages for injury to reputation are not properly

awardable in a breach of contract suit."); *Daley v. Town of W. Brookfield*, 476 N.E.2d 980, 980 n.1 (Mass. App. Ct. 1985) (stating that "[d]amages for injury to reputation are usually not available in contract actions" because they are "remote and not within the contemplation of the parties"); J. Calamari & J. Perillo, The Law of Contracts § 14-18, at 617 (3d ed. 1987) ("Damages for injury to the employee's reputation are ordinarily said to be too remote and not in the contemplation of the parties . . . ."). While this is a correct statement of the general rule, that rule is simply an application of the consequential damages standard to the facts of the typical wrongful discharge case. It may be that in practically all cases of wrongful discharge, damages resulting from harm to a plaintiff's reputation are speculative or outside the contemplation of the parties, but such damages remain appropriate where a plaintiff "proves with sufficient evidence that a breach of contract proximately caused the loss of identifiable professional opportunities." See *Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888, 894 (1st Cir. 1988) (en banc) (holding that such a claim is "sufficiently different from a nonspecific allegation of damage to reputation that it appropriately falls outside the general rule that reputation damages are not an acceptable form of contract damage."). Here, plaintiff seeks to prove that the harm to his reputation caused by the lack of a sufficient hearing caused him to lose specific job opportunities, and that such losses were foreseeable by both parties, given the public profile of his position. He is entitled to those damages if he can prove they satisfy our general requirements for consequential damages. We thus remand for the superior court to enter judgment in favor of plaintiff on the issue of defendants' liability for breach of contract, and to determine the amount of plaintiff's damages. See V.R.C.P. 56(c)(3) ("A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.").

## II. Due Process

¶ 24. We next address plaintiff's claim that defendants deprived him of due process under color of state law. Title 42 U.S.C. § 1983 creates a cause of action for any person injured by a deprivation of rights secured by federal law. To establish a claim for a violation of procedural due process rights, plaintiff first must show that he was deprived of a constitutionally protected interest. *Hegarty v. Addison County Humane Soc'y*, 2004 VT 33, ¶ 15, 176 Vt. 405, 848 A.2d 1139. We look

only to the nature of the interest at stake, not its weight or importance to the plaintiff, in determining whether "the interest is within the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 570-71 (1972). Plaintiff bases his procedural due process claims against defendants on deprivations of both his property and his liberty. We hold that the superior court was correct to grant summary judgment to defendants on the question of plaintiff's property interest, but that summary judgment was premature regarding the deprivation of plaintiff's liberty interest.

### A. Plaintiff's Property Interest

■ ¶ 25. Constitutionally recognized property interests in public employment arise from state-law rules or understandings that secure certain benefits. *Id.* at 569-70. For example, the United States Supreme Court has recognized a property interest for employees who are statutorily entitled to their jobs unless they are dismissed for cause. See, e.g., *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538-39 (1985). When an employee has a protected property interest, the government may not impinge this right without notice and an adequate opportunity to be heard. *Quinn v. Grimes,* 2004 VT 89, ¶ 8, 177 Vt. 181, 861 A.2d 1108.

■ ¶ 26. Plaintiff grounds his property deprivation claim on his asserted "right to serve as principal for the full term of his contract, absent just cause to dismiss him and a hearing." Although the terms of plaintiff's contract and the provisions of 16 V.S.A. § 243 create a property interest in his employment, his interest extends only as far as the economic benefits that flow from his employment. A public employee "does not have any right to actually hold [a] position and execute the duties of [his] office." See *Harris v. Bd. of Educ. of City of Atlanta,* 105 F.3d 591, 596-97 (11th Cir. 1997); see also *Royster v. Bd. of Trs. of Anderson County,* 774 F.2d 618, 621 (4th Cir. 1985) (concluding that "[superintendent's] contract afforded him only the right to be fully compensated, and not the right to occupy the office of superintendent"); *Kinsey v. Salado Indep. Sch. Dist.,* 950 F.2d 988, 997 (5th Cir. 1992) (en banc) (holding that claimant did not have a protected property interest in serving as superintendent). Plaintiff was paid in full through the end of his contract. Accordingly, defendants did not deprive plaintiff of a protected property interest, and no process was due under the Fourteenth Amendment.

## B. Plaintiff's Liberty Interest

¶ 27. Plaintiff next asserts defendants deprived him of liberty without due process. Among the freedoms encompassed by the Fourteenth Amendment's protection of liberty is the right "to engage in any of the common occupations of life." *Roth*, 408 U.S. at 572. When the government makes charges that could damage an employee's reputation in the process of firing or declining to rehire him, due process requires that the employee be afforded the opportunity to refute the charges levied against him. *Id.* at 573. To establish a claim for a deprivation of liberty without due process under § 1983, plaintiff must show that defendants "create[d] and disseminate[d] a false and defamatory impression about [him] in connection with his termination," and that he was denied an effective name-clearing hearing. See *Codd v. Velger*, 429 U.S. 624, 628 (1977).

¶ 28. Courts have recognized an implicit requirement that the defamatory statements be more than "vague statements of unspecified 'incompetence.'" *O'Neill v. City of Auburn*, 23 F.3d 685, 693 (2d Cir. 1994). Virtually every federal circuit recognizes a specificity require-ment and has dismissed claims on the ground that the alleged state-ments were too vague to implicate a liberty interest. See, e.g., *Head v. Chicago Sch. Reform Bd. of Trs.*, 225 F.3d 794, 802 (7th Cir. 2000) (holding that charge of "ineptitude" did not implicate a liberty interest); *Green v. St. Louis Housing Auth.*, 911 F.2d 65, 69 (8th Cir. 1990) ("Falsely charging an employee with unsatisfactory job performance when terminating him does not infringe his liberty interest . . . ."). Statements accompanying a termination will implicate a liberty interest, however, "when they denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession." *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 630-31 (2d Cir. 1996). Notably, *Donato* involved the termination of an assistant principal, and the court relied heavily on *Huntley v. Community School Board*, 543 F.2d 979, 986 (2d Cir. 1976), where the acting principal of a Brooklyn school was deprived of liberty without due process when the school board fired him and released a public state-ment containing "charges which might impair his chances of future employment as a school supervisor and which might damage his

professional reputation." See *Donato*, 96 F.3d at 631 (comparing facts with *Huntley*).

¶ 29. In this case, the words used to describe plaintiff's termination implied that plaintiff was not simply incompetent, but that he had engaged in some kind of serious misconduct. Members of the board told a reporter that plaintiff's performance evaluation contributed to their decision, but according to the reporter, "also said there had been potentially costly and damaging reasons for the firing — reasons not fit for public review." In addition, the superior court recognized that in the educational community, an administrator is placed on administrative leave during the school year only for serious misconduct, and once this occurs, the administrator becomes virtually unemployable. The circumstances surrounding plaintiff's dismissal, coupled with the strong, yet ambiguous, public statements by defendants, could have led potential future employers to conclude that plaintiff had not only performed poorly as principal, but was also unfit to work in a school environment in any capacity. See *Green*, 911 F.2d at 69 (stating that a liberty interest is implicated by allegations that "injure the employee's good name, reputation, honor or integrity," as such charges "imply an inherent or at least a persistent personal condition, which both the general public and a potential future employer are likely to want to avoid. Inadequate job performance, in contrast, suggests a situational rather than an intrinsic difficulty; as part of one's biography it invites inquiry, not prejudgment." (quotations omitted)). The combination of defendants' actions and their statements could thus have amounted to "charge[s] against [plaintiff] that might seriously damage his standing and associations in his community." *Roth*, 408 U.S. at 573.

¶ 30. Defendants argue that the jury's verdict in their favor on plaintiff's defamation claim precludes his claim of a deprivation of liberty. Defamation and liberty deprivations of this sort are somewhat similar, but not identical, and we have no way of knowing on what grounds the jury rejected plaintiff's defamation claim. To prove defamation, plaintiff would have had to show, by clear and convincing evidence, that defendants made false statements knowingly or with reckless disregard for their veracity. *Palmer v. Bennington Sch. Dist., Inc.*, 159 Vt. 31, 39, 615 A.2d 498, 503 (1992). The jury could have rejected the defamation claim because it did not find defendants to have made false statements knowingly or recklessly, or because plaintiff failed to meet the "clear and convincing evidence" standard required for defamation. *Id.* It thus remains possible for plaintiff to

prove each element of his deprivation of liberty claim despite the jury's rejection of his defamation claim.

¶ 31. Defendants finally argue that even if they did make statements that could have injured plaintiff's reputation, plaintiff was given an adequate opportunity to clear his name at the January 11, 2002 meeting. According to defendants, plaintiff was given sufficient notice and was allowed to present evidence on all relevant issues. As we have discussed above, however, the January 11 meeting seemed to address only plaintiff's performance evaluation. The meeting does not appear to have addressed any other allegations of misconduct — such as those "not fit for public review." Yet, in the Rutland Herald article, if it was accurate, the board members implied that they had some extraordinary reason, beyond plaintiff's alleged incompetence, for dismissing him. The Due Process Clause entitled plaintiff to some opportunity to confront and refute such allegations.

¶ 32. The questions of what took place at the January 11 meeting, what issues the meeting addressed, and whether plaintiff had an opportunity to address the allegations against him are all material facts that have not been resolved by the superior court. Summary judgment was thus inappropriate. See V.R.C.P. 56(c)(3) ("Judgment shall be rendered forthwith if . . . there is no genuine issue as to any material fact and . . . any party is entitled to judgment as a matter of law."). We therefore remand so that the superior court may determine whether plaintiff was deprived of a constitutionally protected liberty interest.

*Reversed in part and remanded for further proceedings consistent with the views expressed herein.*