Raymond HOLMES, Jr., Plaintiff,

v.

Thomas GAYNOR, Dennis Hardy and the Village of Piermont, New York, Defendants.

No. 00CIV.9058(LTS)(GAY).

United States District Court, S.D. New York.

April 16, 2004.

---

**3.** The sheer magnitude of this Memorandum of Law indicates that FORSA's suit was not

wholly without merit.

Lovett & Gould, By Drita Nicaj, Esq., White Plains, NY, for Plaintiff.

Renzulli & Rutherford, LLP by Lewis R. Silverman, Esq., New York City, Miranda & Sokoloff, LLP by Michael A. Miranda, Esq., Brett A. Scher, Esq., Mineola, NY, for Defendants.

*OPINION AND ORDER*

SWAIN, District Judge.

Before the Court are the motions of Defendants Thomas Gaynor ("Gaynor"), Dennis Hardy ("Hardy"), and The Village

of Piermont, New York ("the Village" or "Piermont") for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff Raymond Holmes, Jr. ("Plaintiff" or "Holmes"), a former employee of the Village, asserts three causes of action pursuant to 42 U.S.C.A. § 1983, all stemming from alleged violations of his rights under the Fourteenth Amendment to the United States Constitution. Plaintiff alleges that: 1) all Defendants engaged in a selective prosecution of Plaintiff, relating to Plaintiff's suspected involvement in an illegal dumping scheme, in violation of Plaintiff's right to equal protection, 2) Defendants Hardy and the Village terminated Plaintiff's employment without a pre-deprivation hearing in violation of Plaintiff's right to due process, and 3) Defendants Gaynor and the Village defamed Plaintiff in connection with the termination, thus depriving Plaintiff of his liberty interest in his reputation. Plaintiff also seeks punitive damages against Defendants Gaynor and Hardy. Defendants move for judgment as a matter of law with respect to all of Plaintiff's claims.

The Court has subject matter jurisdiction of Plaintiff's claims pursuant to 28 U.S.C.A. §§ 1331 and 1343 (West 1993).

For the following reasons, Defendants' motions for summary judgment are granted.

## BACKGROUND

The following facts are undisputed except where characterized as allegations or contentions. Plaintiff Holmes spent the better part of three decades in the employ of the Village of Piermont. Plaintiff began working full-time for the Village Highway Department, also known as the Department of Public Works ("DPW"), in 1971, and became a motor equipment operator for the Village in 1974. (Tr. 6/6/2001 Holmes Dep. at 17, Exh. C to Miranda

Decl.) Plaintiff also worked for the Village as a part-time police officer from 1971 until his retirement from that job in December 1992, and as a fire inspector from 1975 until 1976. (Tr. 6/6/2001 Holmes Dep. at 24, Exh. C to Miranda Decl.; Letter of Retirement dated 12/7/92, Exh. 1 to Nicaj Aff.) In 1992, Plaintiff became maintenance supervisor for the DPW, assuming responsibility for the work of the entire department. (Tr. 6/6/2001 Holmes Dep. at 19–21, Exh. C to Miranda Decl.)

Defendant Gaynor has been a Piermont police officer since around 1978, and has served as Chief of Police for the Village since 1985. (Id. at 26; Tr. 6/11/2001 Gaynor Dep. at 5, 7, 9, Exh. 5 to Silverman Aff.) Defendant Hardy is a lifelong resident of the Village of Piermont. He served two terms as the Village's Mayor, holding the part-time paid position from March 1997 to March 2001. Prior to that, from 1991 through 1992, Hardy served as a member of Piermont's Board of Trustees. (Tr. 6/8/2001 Hardy Dep. at 4, 7, 12, Exh 4. to Silverman Aff.)

*Defendant Gaynor's Alleged Personal Animus Toward Plaintiff*

Plaintiff alleges generally that Gaynor developed animus toward Plaintiff many years ago because Gaynor became aware that Plaintiff had spoken to the then Village Board Members and Mayor about Gaynor. (Tr. 6/6/2001 Holmes Dep. at 41–43, Exh. C to Miranda Decl.) Plaintiff contends that Gaynor's animus manifested itself over the years in a variety of ways. Plaintiff alleges that, in or around 1985, Gaynor promised Plaintiff a pay raise upon Plaintiff's completion of Police Academy training, but that Gaynor failed to make good on his promise once Plaintiff actually completed the training. (Id. at 170.) Plaintiff also contends that Plaintiff's hours were reduced drastically once Gaynor became Police Chief. Plaintiff alleges

that certain types of assignments he received prior to Gaynor's taking office were instead given to full-time officers, who were paid time-and-a-half, after Gaynor became Chief. (*Id.* at 172.) Plaintiff complained to the Village Board about the reductions, and, according to Plaintiff, his complaint was followed by a further hours reduction which resulted in Plaintiff working only about six days over the last six months of his employment with the Village Police Department. Plaintiff further contends that Gaynor imposed more stringent requirements relating to Plaintiff's completion and submission of paperwork in the wake of his complaint to the Board. (*Id.* 174–76.)

In addition, after Plaintiff's retirement from the police force in December 1992, Gaynor refused, despite repeated requests from Plaintiff, to issue the retirement badge and identification that is customarily given as an honor to police department retirees. Gaynor contends that he denied Plaintiff's request both because he believed that Plaintiff was ineligible to retire at the time he stopped working for the department, and because of the circumstances surrounding Plaintiff's departure (Plaintiff refused to work a Christmas Eve shift he had been scheduled to work around the time that he stopped working for the Police Department). (Tr. 6/15/2001 Gaynor Dep. at 53–61, Exh. 5 to Silverman Aff.) Plaintiff alleges that Gaynor, in response to one of Plaintiff's requests about the badge and identification, asked to see a letter confirming that Plaintiff had retired and that, after Plaintiff produced such a letter, Gaynor responded with profanity directed at Plaintiff and said, "I wasn't giving you anything anyway." (Tr. 6/6/2001 Holmes Dep. at 183, Exh. C to Miranda Decl.) Plaintiff also approached Defendant Hardy about the issue during Hardy's first term as mayor, prompting Hardy to speak with Gaynor. Gaynor expressed to Hardy his belief that Plaintiff had been fired, rather than having retired, and therefore should not receive the badge and identification. (Tr. 6/8/2001 Hardy Dep. at 142, Exh. 4 to Silverman Aff.) Ultimately, the Village Board decided to award Plaintiff the identification, but declined to issue the badge in deference to Gaynor's wishes. (*Id.* at 145–147.)

In addition, Plaintiff alleges that, in or about 1998, Gaynor conducted an investigation relating to garbage that was being picked up just outside the Village boundary at the residence of a former Village employee. (*Id.* at 33.) The DPW, which Plaintiff headed, was responsible for picking up garbage. Gaynor told the Village Board that he preferred that the issue be handled administratively rather than through the criminal justice process, and he recommended that the Board impose a fine equal to the amount a private contractor would have charged for garbage collection. Gaynor also stated in his deposition that he did not recommend that any action be taken against the employees who actually picked up the garbage. Plaintiff was ultimately fined $500 by the Board for permitting the illegal pickups. (Tr. 6/15/2001 Gaynor Dep. at 71–74, Exh. 5 to Silverman Aff.)

Plaintiff also contends that, in 1998, Gaynor yelled at Plaintiff in the Village Hall because Plaintiff had failed to comply with Gaynor's request that Plaintiff paint Gaynor's office. Plaintiff further alleges that Gaynor also yelled at Plaintiff in the Village Hall in connection with Plaintiff's refusal to adhere to Gaynor's request that he close off a street. (Tr. 6/6/2001 Holmes Dep. at 189–98, Exh. C to Miranda Decl.)

Gaynor sent a memo to the Mayor, Village Board and City Attorney, dated April 15, 1999, informing them of a report made to the police department that an illegal refuse pickup had occurred on a certain date, and that the DPW crew who made

the pickup had been given money by the suspected dumper to purchase lunch that day. Gaynor wrote in the memo that he believed the allegations to be "very disturbing" given the recent problems the Village had had with Plaintiff concerning illegal pickups, and that, although Gaynor had not conducted a full investigation and was unable to offer an opinion as to the validity of the charges, he believed the Board should handle the matter administratively, taking strong action if the allegations were to be proven true because, if the police department went forward with an investigation, Plaintiff could potentially face arrest on felony charges. (Gaynor Mem. Re: Allegations Against D.P.W., dated April 15, 1999, Exh. 6 to Nicaj Aff.)

*The Dumping Investigation*

In 2000, Plaintiff became a target of an investigation, spearheaded initially by Defendant Gaynor, into alleged illegal dumping along the Village pier, which juts out into the Hudson River at the Village's southern end.

The Village of Piermont maintained a landfill for household garbage near the pier along the Village's southern waterfront until the mid–1970's, when the landfill was closed and a Little League baseball field was built at the site. (Tr. 6/6/2001 Holmes Dep. at 44, Exh. C to Miranda Decl.) The landfill was closed at the behest of the New York State Department of Environmental Conservation ("DEC"). The area by the pier is considered to be New York State protected tidal wetlands. (Tr. 6/8/2001 Hardy Dep. at 20, 257, Exh. 4 to Silverman Aff.; DEC Simplified Information, Exh. 14 to Silverman Aff.) After the construction of the Little League field, the area to the northeast of the field was used for the dumping of compost (also known as biodegradable materials) such as leaves, small branches and brush. (Tr. 6/6/2001 Holmes Dep. at 44, Exh. C to Miranda Decl.) The compost site was au-

thorized by the Village. (Tr. 6/8/2001 Hardy Dep. 20, 148, Exh. 4 to Silverman Aff.) According to Defendants, dumping of other types of materials at the site was prohibited. (*Id.* at 45.)

In May 1999, Fred Lowell, a Piermont resident who lives across from the Little League field, complained that he had witnessed impermissible dumping occurring in an area along the Village pier. Lowell expressed his concerns in a statement to Piermont's Board of Trustees, delivered during a May 4, 1999, Board Meeting. (Village Board Meeting Minutes, May 4, 1999, Exh. 17 to Silverman Aff.). Prompted by Lowell's complaints, Mayor Hardy sent Plaintiff a one-sentence memo, dated May 6, 1999, stating that "[a]ny large tree stumps, etc., received by the Village will be taken to Clarkstown for their disposal." Hardy also spoke to Plaintiff personally, directing him not to allow dumping of anything other than leaves and light brush. (Hardy Memo dated May 6, 1999, Exh. 18 to Silverman Aff.; Tr. 6/8/2001 Hardy Dep. 110–11, Exh. 4 to Silverman Aff.)

Plaintiff alleges, however, that Hardy also informed Plaintiff in a conversation around the time of the May 6, 1999, memo that the DPW could continue dumping "roadside debris." (Tr. 6/6/2001 Holmes Dep. at 56, Exh. C to Miranda Aff..)

In November 1999, Lowell again complained that he witnessed illegal dumping going on at the pier site. (Incident Report, dated 1/17/01, Exh. 8 to Nicaj Aff.; Tr. 6/8/2001 Hardy Dep. 118, Exh. 4 to Silverman Aff.) According to Defendants, Lowell showed Hardy photographs of a truck with markings on it indicating that it belonged to a private construction company called Raines & Welsch, which primarily did work for the utility company United Water. (Tr. 6/8/2001 Hardy Dep. 119–120, Exh. 4 to Silverman Aff.) Defendant Hardy contends that the pictures show the

Raines & Welsch truck dumping debris at the pier site, and the area then being covered over again by dirt from the same site. (*Id.*)

On November 22, 1999, Mayor Hardy sent a letter to United Water Company advising it that the Village could *"no longer"* allow United Water to dispose of construction materials" at the pier site. (Hardy Letter to United Water, dated 11/22/99, Exh. 4 to Nicaj Aff. (emphasis in original).) Then, on December 29, 1999, Hardy sent another memo to Plaintiff, advising Plaintiff that the Village was aware that Plaintiff had permitted Raines & Welsch to dump concrete slabs and other materials at the pier site despite Hardy's prior order directing Plaintiff not to allow dumping at the site. Hardy warned "that any further acts on [Plaintiff's] part outside the scope of [his] authority and in disregard of [Hardy's] orders will undoubtedly trigger further disciplinary action." (Hardy Memo to Holmes, dated 12/29/99; Exh. 20 to Silverman Aff.)

Also in December 1999, Village Trustee Veronica Hickey reported to Police Chief Gaynor that two DPW workers had informed her that Plaintiff was permitting illegal dumping to occur at the pier site as well as at another site nearby, and that the workers had implied that Plaintiff was receiving or had received some financial reward (referred to as "Christmas envelopes") in return for allowing dumping at the pier site. (Tr. 6/11/2001 Gaynor Dep. at 9, Exh. 5 to Silverman Aff.; Tr. 7/17/2001 Hickey Dep. at 7, 10; Exh. 22 to Silverman Aff.) The two workers were Ed Miggins and Tom Temple. (Tr. 7/17/2001 Hickey Dep. at 8, Exh. 22 to Silverman Aff.)

Upon returning from his vacation in January 2000, Chief Gaynor began an investigation relating to the allegations of illegal dumping at the two sites, and prepared an incident report. According to the incident report, Gaynor inspected both locations and "found that there was significant fill dumped at both locations containing dirt, concrete, blacktop and wood." (Incident Report, dated 1/17/01, Exh. 8 to Nicaj Aff.) As part of the investigation, Gaynor also interviewed a number of potential witnesses, including various DPW employees and adjacent property owners. (*Id.*; Tr. Gaynor Dep. 6/11/01 at 34, Exh. 5 to Silverman Aff.) In addition, according to the incident report, Rockland County BCI detective Brian Sherry photographed the locations. (Incident Report, dated 1/17/01, Exh. 8 to Nicaj Aff.) During their respective interviews, both Miggins and Temple disavowed any knowledge of Plaintiff having received financial consideration in exchange for allowing contractors to dump. (Tr. 6/15/2001 Gaynor Dep. 48–56, Exh. 5 to Silverman Aff.)

On January 12, 2000, the Rockland County District Attorney's Office ("DA's Office"), which became involved in the investigation at the police department's request within a couple of days of the investigation's inception, obtained a search warrant permitting it to search for "Village of Piermont Department of Public Works ... Log Books from the year 1996 to 2000 inclusive ...." (Search Warrant, dated 1/12/00, Exh. H to Miranda Decl.; Tr. 6/11/2001 Gaynor Dep. at 61, Exh. 5 to Silverman Aff.) Defendant Gaynor contends that he reviewed the log books and found evidence indicating that a number of contractors had used the pier site. (Tr. 6/11/2001 Gaynor Dep. at 82–87; Exh. 5 to Silverman Aff.)

The assistance of the DEC was also enlisted, at the request of the DA's Office. (Incident Report, dated 1/17/01, Exh. 8 to Nicaj Aff.; Tr. 6/11/2001 Gaynor Dep. at 62, Exh. 5 to Silverman Aff.; Tr. 6/15/2001 Gaynor Dep. at 113, Exh. 5 to Silverman Aff.) On January 21, 2000, the DEC sent a

letter indicating that it had inspected the pier site and found evidence of several violations, including the presence of several thousand tons of unauthorized debris "in the adjacent area (AA) of a New York State protected Tidal Wetland without authorization." (DEC Letter, dated 1/21/00, Exh. 25 to Silverman Aff.)

The Village Police Department obtained supporting depositions from a number of witnesses, including DPW employees Edward Miggins and Alan Bartley, as well as Defendant Hardy. In his supporting deposition, Miggins stated that Plaintiff had directed him in June 1999 to drive a Village truck filled with branches, leaves and other debris to the Piermont Pier and dump the cargo at that location. Miggins further alleged in the deposition that he had queried Plaintiff with regard to the May 1999 directive from the Mayor and Village Board stating that such dumping at said location would no longer be permissible, and Plaintiff had told him to go "down there and dump it and that's all you have to know." (Miggins Supporting Dep., dated 1/20/00, Exh. 16 to Silverman Aff.) Bartley, in his supporting deposition, asserted that, contrary to the May 1999 directive of the Mayor and Village Board, he "was directed to dump at [the pier site] by Piermont [DPW] foreman Raymond Holmes on at least a dozen occasions after May of 1999." (Bartley Supporting Dep., dated 1/20/00, Exh. 16 to Silverman Aff.) In his supporting deposition, Hardy stated that neither he nor any Board member had given Plaintiff permission "to dump construction debris or any other materials [at the pier site]," and that there was no Village policy "to dump or fill in the aforesaid property with any type of materials." (Hardy Supporting Dep., date 1/21/00, Exh. 16 to Silverman Aff.)

Chief Gaynor also opened investigations into the possible involvement of a number of other entities in illegal dumping at the pier site, including Orange and Rockland Utilities, United Water Company, Asplundh, JD Backhoe and Raines & Welsch. (Tr. 6/15/2001 Gaynor Dep. at 108, Exh. 5 to Silverman Aff.) Supporting depositions were taken from various DPW employees and others in connection with these investigations. (*Id.* at 117–18.)

When presented with the possibility that Plaintiff would be arrested, Defendant Hardy said to Defendant Gaynor, "Let the chips fall where they may. Do what you have to do." (Tr. 6/15/2001 Gaynor Dep. at 110, Exh. 5 to Silverman Aff.)

On January 21, 2000, Plaintiff, who was out of work on workers' compensation leave, was interviewed in a non-custodial setting at the Village Hall by Gaynor, Sergeant Michael O'Shea of the Piermont Police Department, Officer Greg Tobin of the Clarkstown Police Department and Officer Jill Kaufman of the DEC. Plaintiff was arrested and arraigned that evening before Judge Ciganek in Orangetown Municipal Court on charges of Criminal Mischief (two counts) and Official Misconduct (two counts). Judge Ciganek also issued an Order of Protection, effective until July 26, 2000, prohibiting Plaintiff from contacting DPW employees spoken to during the investigation. Plaintiff's weapons were seized. The DEC also issued several charges against Plaintiff for alleged violations of environmental regulations. Plaintiff was never charged with bribery. (Incident Report, dated 1/17/01, Exh. 8 to Nicaj Aff.; Order of Protection, dated 1/21/00, Exh. M to Miranda Decl.) Defendant Gaynor contends that the particular charges brought against Plaintiff were the result of a decision made collectively by the Piermont Police Department, the DEC and the Rockland County DA's Office. (Tr. 6/15/2001 Gaynor Dep. at 6, 113, Exh. 5 to Silverman Aff.) Plaintiff was released upon his own recognizance that same day. (In-

cident Report, dated 1/17/01, Exh. 8 to Nicaj Aff.)

Subsequent to Plaintiff's arrest, on January 24, 2000, a representative of Raines & Welsch, one of the contractors under investigation, told Gaynor during an interview that Defendant Hardy had permitted that company to engage in dumping at the pier site. (Tr. 6/11/2001 Gaynor Dep. at 62–63, Exh. 5 to Silverman Aff.) Upon learning that Mayor Hardy may have been involved, the Piermont Police Department turned the lead role in the investigation over to the Rockland County DA's Office on the ground that it would be a conflict of interest for the Village police to be investigating Mayor Hardy. (*Id.* at 59–60, 67.) All evidence that had been accumulated pursuant to the dumping investigations was then turned over to the DA's Office. (*Id.* at 82.)

In addition, Defendant Gaynor contends that during the course of the investigation he became aware of some evidence suggesting that the Village Attorney may have known about the illegal dumping and failed to do anything about it. Gaynor asserts that he reported the matter to the Rockland County DA's Office, which at the time had already assumed the role of lead investigator. (*Id.* at 104–05.)

Grand jury proceedings against Plaintiff began in May 2000. The grand jury voted not to indict Plaintiff, and all charges against Plaintiff were dismissed on September 13, 2000. No charges were ever brought against Hardy, any DPW employees other than Plaintiff, the Village Attorney, members of the Village Board or any of the contractors who were investigated in connection with the dumping allegations.

*Circumstances of Plaintiff's Departure from the Village of Piermont's Employ*

In September 1999, Plaintiff developed an infection on his right hand after sustaining a small scratch while cleaning up in the aftermath of Hurricane Floyd. Due to the injury, Plaintiff was intermittently absent from work on workers' compensation leave from September 1999 through January 2000, when he had surgery. (*See* Plaintiff's Pay Sheets, Exh. 7 to Silverman Aff.) Plaintiff did not return to work after having surgery. On January 31, 2000, Mayor Hardy sent Plaintiff a letter advising Plaintiff that he was to inform the Village at least five days in advance of returning to work. At no point did Plaintiff ever inform the Village that he intended to come back to work. Plaintiff received workers' compensation benefits as well as his regular salary for at least part of the time during which he was out of work.

While the criminal charges against Plaintiff were still pending, the Village consulted attorney Richard Zuckerman, Esq., regarding the possibility of terminating Plaintiff. The Village Board was considering terminating Plaintiff's employment at the time. (Defs. Hardy and Village's Mem. in Support of Motion for Summary Judgment at 9.) Upon the advice of counsel, the Village Board decided to take no action with respect to Plaintiff's employment at that time. (Tr. 6/8/2001 Hardy Dep. at 216–28, 220–22, Exh. 4 to Silverman Aff.)

Defendants Hardy and the Village contend that, following the dismissal of the criminal charges against Plaintiff in September 2000, the Village Board directed Hardy to send Plaintiff a letter on October 18, 2000. (*Id.* at 231–33.) The letter advised Plaintiff that, because he had been out of work due to a disability compensable under the New York State Workers' Compensation Law for a cumulative period of more than one year, the Village had the right pursuant to New York Civil Service Law Section 71 to terminate his employment. (Hardy Letter to Holmes, dated 10/18/00, Exh. 10 to Silverman Aff.) The

letter further advised Plaintiff that his "employment with the Village may be terminated as of October 31, 2000." Plaintiff was given an opportunity to file a written statement by October 30, 2000, challenging the Village's understanding of the relevant facts. (*Id.*) Plaintiff was also advised that, "[i]n addition, or in the alternative," he would be given an opportunity to meet with Hardy on October 24, 2000, at 5:30 p.m., to discuss any reasons he may have for disputing the Village's findings and/or decision to terminate his employment. (*Id.*)

Plaintiff's attorney, John K. Grant, responded to Hardy's October 18, 2000, letter with a letter of his own, dated October 24, 2000. Grant indicated that the time afforded to Plaintiff to consider the Village's position was insufficient. Grant also argued that the dates set forth in Hardy's letter relating to Plaintiff's absences from work were incorrect, that Plaintiff had been prohibited from returning to work for part of the period cited in Hardy's letter because of the Order of Protection issued by Judge Ciganek, and that Plaintiff's absences from work had been sporadic rather than continuous, such that the one year period referred to in Hardy's letter would not expire until December 9, 2000. Finally, Grant demanded a pre-termination hearing on the issues raised in his letter. (Grant letter to Village Clerk, dated 10/24/00, Exh. 19 to Nicaj Aff.)

According to Defendants Hardy and the Village, the October 24, 2000, meeting was rescheduled at Grant's request for November 28, 2000 at the Village Hall. (Icobelli Letter to Holmes, dated 11/22/00, Exh. 11 to Silverman Aff.) Plaintiff contends that no termination hearing was scheduled after Grant sent his October 24, 2000, letter. (Pl. Rule 56.1 St. ¶ 52.)

Plaintiff alleges that he was effectively terminated as of October 3, 2000, when his subordinate Al Bartley took over Plaintiff's position as head of the DPW. (*See* Article from The Journal News, undated, Exh. 20 to Nicaj Aff.) Defendant Hardy contends that Bartley did not become head of the DPW until sometime in 2001. (Tr. 6/8/2001 Hardy Dep. at 100, Exh. 4 to Silverman Aff.)

On November 10, 2000, Plaintiff served the Village with a Notice of Claim alleging malicious prosecution. (Notice of Claim, dated 11/10/00, Exh. 12 to Silverman Aff.) Plaintiff filed an Application for Service Retirement that was received by the New York State and Local Retirement System on November 17, 2000. The application indicated that Plaintiff's effective retirement date would be December 28, 2000. (Application for Service Retirement, dated 11/15/00, Exh. 8 to Silverman Aff.) Plaintiff filed the complaint in the instant case, which is dated November 19, 2000, on November 28, 2000. Around that time, the Village suspended Plaintiff's pay as of November 1, 2000. (Tr. 6/8/2001 Hardy Dep. at 101–02, Exh. 4 to Silverman Aff.; Defs. Hardy and Village's Mem. in Support of Motion for Summary Judgment at 10.)

On December 5, 2000, after the filing of the instant lawsuit, the Village Board passed a resolution reciting that Plaintiff was never terminated by the Village and providing that the Village would therefore pay Plaintiff from November 1, 2000, the date the suspension of his pay became effective, until December 28, 2000, the effective date of his retirement, in the same manner as he had been paid prior to November 1, 2000—as if he was on a workers' compensation paid leave of absence.

## DISCUSSION

*Summary Judgment Standard*

Summary judgment shall be granted pursuant to Rule 56(c) of the Federal Rules of Civil Procedure where "the plead-

ings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The initial burden is on the moving party to show the absence of a genuine issue of material fact. *Am. Home Assurance Co. v. ZIM JAMAICA,* 296 F.Supp.2d 494, 498 (S.D.N.Y.2003); *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. In deciding a motion for summary judgment, a court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Am. Cas. Co. of Reading, Pa. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994) (internal citation omitted). However, "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 175 (2d Cir.2003) (internal citation omitted).

*Selective Prosecution*

Plaintiff argues that his arrest and prosecution on charges relating to suspected authorization of illegal dumping in the area around the Village pier violated his right to protection against selective prosecution because no one else was arrested or charged in connection with the suspected dumping.

In order to establish an equal protection violation on the basis of selective

prosecution, a plaintiff must show that: "(1) compared with others similarly situated, he was selectively treated; and (2) such selective treatment was based upon impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Estate of Morris v. Dapolito,* No.03 CIV. 6641(WCC), 2004 WL 74480, at *5 (S.D.N.Y. Jan. 12, 2004) (citing *LaTrieste Restaurant & Cabaret v. Port Chester,* 40 F.3d 587, 590 (2d Cir.1994)). The Second Circuit has "been careful to apply each prong of the test separately, finding the failure to satisfy either inquiry fatal to plaintiff's claim." *A.B.C. Home Furnishings, Inc. v. Town of East Hampton,* 964 F.Supp. 697, 702 (E.D.N.Y.1997) (citing *Zahra v. Town of Southold,* 48 F.3d 674, 683 (2d Cir.1995)).

As to the first prong of the analysis, to be "similarly situated," the persons "at issue need not be identical, but must be similar in 'all material respects.'" *DePace v. Flaherty,* 183 F.Supp.2d 633, 639–640 (S.D.N.Y.2002) (quoting *Shumway v. United Parcel Service,* 118 F.3d 60, 64 (2d Cir.1997)). "'Exact correlation is neither likely nor necessary;' the test is whether a prudent person would think them roughly equivalent." *Id.* at 640 (quoting *Penlyn Dev. Corp. v. Inc. Vill. of Lloyd Harbor,* 51 F.Supp.2d 255, 264 (E.D.N.Y.1999)). Stated another way, "'[t]he test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as in the lawyer's art of distinguishing cases, the 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.'"

A.B.C. Home Furnishings, Inc., 964 F.Supp. at 702 (quoting *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir.1989)).

### Defendant Gaynor

■ With respect to Plaintiff's selective prosecution claim against Defendant Gaynor, it is undisputed that Gaynor turned over responsibility for the investigations relating to the suspected illegal dumping to the Rockland County DA's Office upon learning of evidence that potentially implicated Mayor Hardy in the suspected wrongdoing. Gaynor has also proffered undisputed evidence that he did not learn about the Village Attorney's possible knowledge of the illegal dumping until after he had relinquished control over the investigations to the DA's Office. Once the evidence potentially implicating Hardy came to light, and before the evidence potentially implicating the Village Attorney was discovered, the Rockland County DA's Office, which is not a party to this case, assumed ultimate responsibility for deciding whether to prosecute Hardy and the Village Attorney. Hence, a rational factfinder could not conclude that Gaynor singled out Plaintiff for arrest and/or prosecution compared to Mayor Hardy or the Village Attorney because Plaintiff has not proffered evidence that Gaynor was in a position to make prosecutorial decisions after uncovering evidence implicating Hardy and the Village Attorney.

■ Plaintiff has proffered evidence that Gaynor was aware, prior to relinquishing control over the various dumping investigations, of the potential involvement in the suspected dumping of various contractors and certain other DPW employees, none of whom was ever arrested or prosecuted. Viewing the facts in the light most favorable to Plaintiff, the Court concludes, however, that Plaintiff has failed to meet his burden of proffering evidence sufficient to permit a rational factfinder to conclude that any of those persons was "similarly situated" to Plaintiff.

It is undisputed that Plaintiff was the head of the DPW. Although the parties do not specifically describe the role of the DPW in their papers, it is presumed from the general tenor of the parties' submissions that the department was in charge of regulating any dumping that occurred at the pier site. It is also undisputed that Plaintiff in his capacity as DPW head was ultimately responsible for all of the work performed by employees of that department. It therefore cannot be said that Plaintiff was similarly situated in all material respects to the employees who worked under Plaintiff's supervision and were subject to his orders. No evidence has been proffered that other DPW employees were aware of or permitted illegal dumping without Plaintiff's knowledge. In fact, the only evidence of involvement by other DPW employees concerns dumping that was allegedly conducted at the direction of Plaintiff. Further, evidence has been proffered that, on at least one occasion, Plaintiff directed a DPW employee to dump materials improperly even after the employee expressed reservations about whether this practice was permissible. (Miggins Supporting Dep., dated 1/20/00, Exh 16 to Silverman Aff.) The Court thus concludes that a rational juror could not find that Plaintiff was similarly situated in all material respects to other DPW employees.

The Court also finds that a rational juror could not find that Plaintiff was similarly situated in all material respects to the contractors who dumped debris at the pier site. The evidence compiled against Plaintiff, namely, that he authorized multiple private contractors and directed various DPW employees to dump impermissibly at the pier site, suggests suspected

wrongdoing on the part of Plaintiff that was greater in scope and severity than the wrongdoing suspected of any of the contractors. Further, unlike the private contractors, Plaintiff was a public employee who was alleged to have breached the public trust.

*Defendants Hardy and the Village of Piermont*

■ As to Defendants Hardy and the Village, Plaintiff has not proffered any evidence that either had any involvement in the prosecutorial decision-making process. To the extent Gaynor's actions can be imputed to the Village, the Court has already determined that Plaintiff has not proffered facts sufficient for a rational factfinder to conclude that Gaynor's actions amounted to a selective prosecution of Plaintiff in violation of Plaintiff's equal protection rights.

Therefore, viewing the facts in the light most favorable to Plaintiff, the Court concludes that Plaintiff has not proffered evidence sufficient for a rational juror to find that Plaintiff was selectively prosecuted by Defendants Gaynor, Hardy and/or the Village. Accordingly, Plaintiff's selective prosecution claim fails as a matter of law and is dismissed as against all Defendants.

*Denial of a Pre–Termination Hearing*

■■ Plaintiff contends that he was denied a hearing prior to being terminated from his civil service position as head of the DPW for the Village of Piermont, in violation of his Fourteenth Amendment right to due process. "When a governmental employee is found to have a 'property interest' in continuation of his or her employment, the Due Process Clause of the Fourteenth Amendment forbids discharge unless the employee is afforded a pre-termination hearing." *O'Neill v. City of Auburn*, 23 F.3d 685, 688 (2d Cir.1994) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)). New York Civil Service Law Section 75, which governs the procedures by which covered civil service employees may be removed or subjected to other disciplinary action, confers upon employees covered by its provisions such a property interest in their continued employment, "so they may not be terminated without notice and hearing." *Id.* Section 75 provides, in relevant part, as follows:

> A person ... shall not be removed or otherwise subjected to any disciplinary penalty provided in this section except for incompetency or misconduct shown after a hearing upon stated charges pursuant to this section.

N.Y. Civ. Serv. L. § 75 (McKinney 1999).

Defendants Hardy and the Village contend, however, that the discharge alleged by Plaintiff, assuming it took place, occurred pursuant to Civil Service Law Section 71, which governs reinstatement of employees after they have been separated from service because of a work-related injury, rather than pursuant to Section 75. Civil Service Law Section 71 provides, in relevant part, as follows:

> Where an employee has been separated from the service by reason of a disability resulting from occupational injury or disease as defined in the workmen's compensation law, he or she shall be entitled to a leave of absence for at least one year, unless his or her disability is of such a nature as to permanently incapacitate him or her for the performance of the duties of his or her position ... Such employee may, within one year after the termination of such disability, make application to the civil service department or municipal commission having jurisdiction over the position last held by such employee for a medical examination to be conducted by a medical officer selected for that purpose by such department or commission. If, upon such medical examination, such

medical officer shall certify that such person is physically and mentally fit to perform the duties of his or her former position, he or she shall be reinstated to his or her former position, if vacant, or to a vacancy in a similar position or a position in a lower grade in the same occupational field, or to a vacant position for which he or she was eligible for transfer. If no appropriate vacancy shall exist to which reinstatement may be made, or if the work load does not warrant the filling of such vacancy, the name of such person shall be placed upon a preferred list for his or her former position, and he or she shall be eligible for reinstatement from such preferred list for a period of four years....

N.Y. Civ. Serv. L. § 71 (McKinney 1999 & Supp.2004).

It has been held that

a pretermination hearing is not required before a civil service employee may have his or her employment terminated, pursuant to Civil Service Law Section 71. Accordingly, no due process right is implicated when the employment of a civil servant is terminated under th[at] provision of the Civil Service Law without affording the civil servant a pretermination hearing.

*Johnson v. Doe,* No. 00 CIV 3920(JSR)(KNF), 2001 WL 246370, at *3 (S.D.N.Y. Mar. 12, 2001) (citing *Leonard v. Regan,* 143 Misc.2d 574, 540 N.Y.S.2d 958, 960 (1989), *affirmed* 167 A.D.2d 790, 563 N.Y.S.2d 348 (3d Dept.1990)). Defendants point out that, although Plaintiff disputes the grounds for the alleged Section 71 termination, Plaintiff does not dispute that

Defendant Hardy's October 18, 2000, letter specifically stated that Plaintiff's potential termination, which would be effective as of October 31, 2000, was to be pursuant to Section 71. As a result, Defendants assert, Plaintiff was not deprived of a due process right even if he was not afforded a pre-termination hearing.

Plaintiff has not proffered evidence sufficient to create a triable issue of fact as to whether Plaintiff was terminated for disciplinary or other reasons rather than pursuant to Section 71. Hardy's October 18, 2000, letter specifically references Section 71, and Plaintiff's absence from work due to disability for over one year, as the basis for Plaintiff's termination. According to the October 18, 2000, letter, Plaintiff's termination pursuant to Section 71 could be effected as of October 31, 2000. Consistent with Defendants' contention that, if a termination did occur it happened pursuant to Section 71, Plaintiff's pay suspension, which is the only basis for Plaintiff's contention that he was fired that is backed up by admissible evidence [1], became effective as of November 1, 2000, one day after the one year period for Section 71 purposes was supposed to have expired.

Plaintiff also points to evidence that the subject of Plaintiff's termination had been discussed by Village officials, including Defendant Hardy, at earlier stages of the investigation, even before the one year period would have expired for the purposes of Section 71. (Icobelli Letter to Hardy, dated 12/2/99, Exh. 16 to Nicaj Aff.; Tr. 6/8/2001 Hardy Dep. at 51, Exh. 4 to Silverman Aff.) Such evidence, howev-

---

**1.** To support his contention that he was fired for disciplinary reasons rather than because of his time away from his job due to disability, Plaintiff cites a newspaper article which reports that Plaintiff's second-in-command Al Bartley took over Plaintiff's position as head of the DPW as of October 3, 2000. Plaintiff contends that he was fired as of that date

rather than as of the October 31, 2000, date identified in the October 18, 2000, letter. (*See* Article from The Journal News, undated, Exh. 20 to Nicaj Aff.) The newspaper article, however, is hearsay and inadmissible for proving the truth of the matters asserted therein. *See* Fed.R.Evid. 802.

er, does not give rise to an issue of fact as to whether Plaintiff was fired for reasons other than his extended absence due to disability. The Icobelli letter cited by Plaintiff advised Hardy that, if the Board wanted to fire Plaintiff for disciplinary reasons, Plaintiff would have to be afforded a public hearing before an appointed hearing officer, who would hear the charges and a render a decision as to whether the punishment meted out by the Board was appropriate. (Icobelli Letter to Hardy, dated 12/2/99, Exh. 16 to Nicaj Aff.) In addition, Hardy testified at his deposition that he had many discussions with attorney Richard Zuckerman regarding what approach to take regarding Plaintiff's employment and considered, among other options, the possibility of terminating Plaintiff. (Tr. 6/8/2001 Hardy Dep. at 51, Exh. 4 to Silverman Aff.) However, no admissible evidence has been proffered to indicate that Defendants took any action whatsoever to follow through and fire Plaintiff in connection with such correspondence and conversations. Viewing the facts in the light most favorable to Plaintiff, therefore, the Court concludes that a rational factfinder could not find based on the evidence proffered that Plaintiff was terminated for disciplinary reasons independent of his disability-related absence from work, and therefore would have been entitled to a pre-termination hearing pursuant to Section 75.

■■■■■ Further, even assuming that Plaintiff was entitled to a due process hearing, Plaintiff has not proffered evidence sufficient for a rational factfinder to conclude that Defendants denied Plaintiff that opportunity. When a public employee who has a constitutionally protected property interest in his employment is terminated, "procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards." *Locurto*

*v. Safir*, 264 F.3d 154, 171 (2d Cir.2001) (citing *Cleveland Bd. of Educ. v. Louder-mill*, 470 U.S. 532, 545–46, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)). It is undisputed that Hardy's October 18, 2000, letter scheduled a meeting between Hardy and Plaintiff for October 24, 2000, "to discuss [Plaintiff's] reasons for disputing the Village's findings and/or decision to terminate [Plaintiff's] employment." (Hardy Letter to Holmes, dated 10/18/00, Exh. 10 to Silverman Aff.) Thus, Plaintiff was afforded a pre-deprivation opportunity to be heard. Although it is also undisputed that Plaintiff's lawyer responded with a letter, dated October 24, 2000, the date on which the meeting was to have taken place, Plaintiff has proffered no evidence that he made any effort to pursue a hearing subsequent to the October 24, 2000, letter. In fact, rather than pursuing a hearing after his pay was suspended as of November 1, 2000 (it is not clear from the parties' submissions exactly when the pay suspension was authorized), it is undisputed that Plaintiff filed an application for retirement that was received by the New York State and Local Retirement System on November 17, 2000, thus obviating the need for a post-termination due process hearing. Plaintiff has therefore failed to proffer evidence sufficient to enable a reasonable factfinder to conclude that he was unconstitutionally deprived of a pre- or postdeprivation hearing.

Accordingly, because Plaintiff has not proffered admissible evidence to support his contention that his alleged termination took place pursuant to Section 75 rather than Section 71 of the New York State Civil Service Law, because Plaintiff was not entitled to a pre-termination hearing before being discharged pursuant to Section 71, and because, even if Plaintiff had been entitled to a due process hearing, Plaintiff has not proffered evidence sufficient for a rational factfinder to conclude

that he was denied a hearing, Plaintiff's claim that his due process rights were violated when he· was denied a pre-termination hearing is dismissed as against Defendants Hardy and the Village. .

*Liberty Interest*

 Plaintiff asserts that he was deprived of his liberty interest in his reputation based on defamatory statements that were allegedly made about him, presumably in connection with his alleged termination.

 "[R]eputation alone, apart from some more tangible interests such as employment, is [n]either 'liberty' [n]or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Easton v. Sundram,* 947 F.2d 1011, 1016 (2d Cir.1991) (quoting *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)). Some "stigma plus" is required to constitute a constitutional deprivation. *Easton,* 947 F.2d at 1016. Thus, "a free-standing defamatory statement made by a state official about an employee is not a constitutional deprivation," but rather is "properly viewed as a state tort of defamation." *Donato v. Plainview–Old Bethpage Central School District,* 96 F.3d 623, 630 (2d Cir.1996). "But a defamatory statement about an employee implicates a liberty interest when it is made during the course of that employee's termination of employment." *Id.*

Plaintiff alleges in the Complaint that, at the time of and subsequent to Plaintiff's arrest, Defendant Gaynor and at least one Village Board member "repeatedly and publicly claimed that they had evidence in the form of a 'log book' which proved Plaintiff had been receiving bribes from certain private contractors." (Complaint at ¶ 13.) According to the Complaint, these statements were intended to destroy Plaintiff's reputation and were in all respects false. (*Id.*) In opposing the instant summary judgment motion, however,

Plaintiff has proffered no evidence in the form of affidavits, testimony, etc., indicating that these statements were in fact made, or, assuming that the statements were made, that they were false.

Plaintiff also alleges that Village Trustee Veronica Hickey lied when she told Defendant Gaynor in December 1999 that DPW employees Ed Miggins and Tom Temple had informed her that Plaintiff was receiving Christmas envelopes from contractors in exchange for allowing them to dump at the pier site. It is undisputed that Hickey made such statements. Plaintiff has proffered evidence, in the form of deposition testimony by both Miggins and Temple, denying that they ever said or implied that Plaintiff was taking bribes, to support his contention that Hickey's statements were false. (Tr. 8/1/2001 Miggins Dep. at 17–18, Exh. 12 to Nicaj Aff.; Tr. 8/1/2001 Temple Dep. at 13, Exh. 13 to Nicaj Aff.)

The Court finds, however, that a reasonable factfinder could not determine that Hickey's statements implicated a liberty interest because they were not made during the course of Plaintiff's termination from employment. Plaintiff does proffer evidence that, around the time Hickey made the statements to Defendant Gaynor, the Board had contemplated a number of potential options for disciplining Plaintiff, including termination. (Icobelli Letter to Hardy, dated 12/2/99.) However, Plaintiff alleges that the date of his effective termination was October 3, 2000—over nine months after Hickey's statements were made—when Al Bartley allegedly took over Plaintiff's position as head of the DPW. The Second Circuit has held that "a concurrent temporal link between the defamation and the dismissal is necessary if the employee is to succeed upon a claim of liberty deprivation." *Martz v. Inc. Vill. of Valley Stream,* 22 F.3d 26, 32 (2d Cir. 1994). The requisite link is clearly absent

here. Therefore, even assuming that Hickey's statements are indeed defamatory, such defamation would not rise to the level of a constitutional deprivation.

Plaintiff thus having failed to proffer evidence sufficient to establish that he was deprived of a liberty interest, Defendants Gaynor and the Village are entitled to judgment as a matter of law as to Plaintiff's liberty interest claim.

## CONCLUSION

For the foregoing reasons, the summary judgment motions of Defendants Gaynor, Hardy and the Village are granted in all respects. The Clerk of Court is directed to enter judgment in Defendants' favor and close the case.

IT IS SO ORDERED.